# UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WASHINGTON FEDERAL, MICHAEL McCREDY BAKER, and CITY OF AUSTIN POLICE RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>THE UNITED STATES OF AMERICA,<br><br>  Defendant. | No.  13-cv-385-MMS<br><br>FIRST AMENDED COMPLAINT<br><br> **REDACTED VERSION** |

010347-11 1019773 V1

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER**

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.   PARTIES ......................................................................................................9

III.  JURISDICTION AND VENUE ....................................................................9

IV.   RELEVANT CONSTITUTIONAL PROVISION ..........................................9

V.    FACTUAL BACKGROUND ......................................................................10

    A.    History of Fannie Mae and Freddie Mac ..........................................10

        1.    Creation of Fannie Mae and Freddie Mac ..............................10

        2.    The Success of Fannie Mae and Freddie Mac with
               Investors ..................................................................................13

        3.    The Housing and Community Development Act of 1992
               and the Government's Confidence in the Financial Health
               of the Companies ....................................................................15

        4.    The Companies Had Never Previously Warranted
               Conservatorship ......................................................................16

    B.    As the Financial Crisis Worsened, the Government Weakened the
        Companies' Financial Strength by Causing Them to Increase Their
        Exposure to Riskier Investments, Although to a Far Lesser Degree
        than Other Financial Institutions at the Time ......................................17

    C.    Congress Passed the Housing and Economic Recovery Act of 2008
        to Allow the Government to Impose Conservatorships Over the
        Companies if Certain Criteria Were Satisfied ......................................20

    D.    While Stating Publicly that the Criteria For Conservatorship Were
        Not Satisfied, the Government Planned in Secret to Seize the
        Companies Regardless of Their Financial Condition ..........................23

    E.    The Government Seized Control of the Companies, Falsely
        Portraying the Conservatorships as a Rescue Operation ....................25

        1.    The Conservatorships ..............................................................25

        2.    The Preferred Stock Purchase Agreements ("Purchase
               Agreements") ..........................................................................26

    F.    The Government's Imposition of the Conservatorships Improperly
        Appropriated the Private Property of the Companies' Preferred and
        Common Shareholders ........................................................................30

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

G.     The Government Was Not Statutorily Permitted To Impose the Conservatorships ...................................................................................32

     1.     Neither of the Companies' Shareholders or Boards of Directors Validly Consented to the Conservatorships ............................34

          a.     Neither of the Companies' Shareholders Consented to the Conservatorships ................................................34

          b.     Neither of the Companies' Boards of Directors Validly Consented to the Conservatorships ...................................35

     2.     None of the Other Potential Grounds to Justify Imposition of the Conservatorships Was Present ..........................................40

          a.     The Companies' assets were significantly greater than their liabilities at the time the conservatorships were established ................................................................41

          b.     The Companies had not suffered a substantial dissipation of assets or earnings due to a violation of law or unsafe and unsound practices .........................42

          c.     Neither Company was in an unsafe or unsound condition ...................................................................43

          d.     Neither Company was in violation of any cease and desist order .................................................................44

          e.     Neither Company concealed or refused to submit any books or records .......................................................45

          f.     The Companies were able to pay their obligations and meet the demands of their creditors .........................45

          g.     Neither Company incurred or was likely to incur losses that would deplete all or substantially all of its capital ...................................................................46

          h.     Neither Company violated any law or regulation, or engaged in any unsafe or unsound practice or condition that would likely cause insolvency, a substantial dissipation of assets or earnings, or a weakening of its condition ...........................................47

          i.     Neither Company was undercapitalized .......................47

          j.     Neither Company was critically undercapitalized ........50

          k.     Neither Company was found guilty of money laundering. ...................................................................50

H.     The Government Concealed Its Lack of Authority To Impose the Conservatorships By Having FHFA Adopt Unjustified Accounting

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Policies To Make it Appear that the Companies Were Not and Had Not Been Adequately Capitalized..........................................................................51

    1.    Improper Write-Down of Deferred Tax Assets ........................................52

    2.    Improper Increases to the Level of Loan Loss Reserves ..........................58

I.    Post Conservatorship Events: The Government Strengthens Its Grip on the Companies By Creating The Third Amendment to the PSPAs ........................................................................................................60

VI.    THE GOVERNMENT'S CONDUCT CONSTITUTED AN ILLEGAL EXACTION AND/OR TAKING WITHOUT JUST COMPENSATION IN VIOLATION OF THE U.S. CONSTITUTION ...........................................67

A.    The Government Disregarded the Rights and Property Interests of the Companies' Shareholders in Taking Control of the Companies to Achieve Its Public Policy Objectives..................................................67

    1.    Plaintiffs Had a Property Interest in the Economic Value Associated with Their Shares of Fannie Mae and Freddie Mac Common and Preferred Stock...........................................68

    2.    Plaintiffs had a Reasonable Investment-backed Expectation that the Government Would Not Appropriate Shareholder Value and Rights in the Companies......................................70

B.    The Government's Conduct Constituted a "Taking" Under the Fifth Amendment to the United States Constitution.............................73

    1.    The Imposition of the Conservatorships Constituted a Taking of Private Property.........................................................75

    2.    The August 2012 Amendment to the PSPAs Further Guaranteed that the Taking of Private Property Was Permanent ...................................................................................76

C.    The Companies' Shareholders Have Lost Billions of Dollars as a Result of This Misconduct......................................................................76

VII.    CLASS ALLEGATIONS ................................................................................77

VIII.    CLAIMS FOR RELIEF ...................................................................................79

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

## Table of Acronyms and Abbreviations

| | |
|---|---|
| 1992 Act | Federal Housing Enterprises Financial Safety and Soundness Act of 1992 |
| Fannie Mae | Federal National Mortgage Association |
| FHFA | Federal Housing Finance Agency |
| FIRREA | Financial Institutions Reform, Recovery, and Enforcement Act of 1989 |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| GAAP | Generally Accepted Accounting Principles |
| GSE | Government Sponsored Enterprise |
| HERA | Housing and Economic Recovery Act of 2008 |
| HUD | U.S. Department of Housing and Urban Development |
| MBS | Mortgage-Backed Security |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| PSPAs | Preferred Stock Purchase Agreements |
| Treasury | U.S. Department of Treasury |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

## I.      NATURE OF THE ACTION

1.      Prior to the Government's imposition of conservatorships over them in September 2008, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Companies") were private, shareholder-owned corporations that maintained a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities ("MBS"), and by "guaranteeing" privately owned mortgage-backed securities. Specifically, under their respective statutory charters, the Companies were responsible for: (1) providing stability in the secondary market for residential mortgages; (2) responding appropriately to the private capital market; (3) providing ongoing assistance to the secondary market for residential mortgages; and (4) promoting access to mortgage credit throughout the country.  Fannie Mae was also charged with managing and liquidating federally owned mortgage portfolios in an orderly manner, "with a minimum of adverse effect upon the residential mortgage market and minimum loss to the Federal Government."  Although the Companies were charged with these public missions, since being privatized they had operated successfully for decades on capital raised from private investors, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.

2.      Historically, the Companies' portfolios contained little or no risky subprime and Alt-A (little or no documentation) mortgages.  However, with the country in the throes of the "Great Recession," many other financial institutions had large amounts of these high-risk mortgages in their portfolios.  Faced with evaporating liquidity in the mortgage market due to the unprecedented levels of toxic mortgages and mortgage-backed securities owned by banks and other lending institutions, which threatened to keep these banks from making new loans, the Government made the decision to enable banks to clean up their balance sheets and resume making

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

new loans by dumping their toxic mortgages and securities on Fannie Mae and Freddie Mac.  By the middle of 2008, due in large part to the Government's actions, the Companies had suffered significant losses on certain holdings in their portfolios.  Despite these significant losses exacerbated by the Government's own policies—losses shared by virtually every other financial institution at the time—the Companies remained adequately capitalized and were not insolvent.

3.     Around the same time the Government was requiring the Companies to assume the risky investments of other financial institutions to support the nation's economy, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA").  Among other things, HERA enumerated specific grounds under which the Director of the Federal Housing Finance Agency ("FHFA") was permitted to appoint the FHFA as a conservator over Fannie Mae and Freddie Mac. While Treasury Secretary Henry Paulson publicly characterized the legislation as a "bazooka", he assured the public and Congress that he never anticipated the Companies being placed in conservatorship because the Companies were solvent and adequately capitalized at the time. Privately, however, the Government was marshalling support for a drastically overstated claim that the Companies were in dire financial straits and needed to be taken over.

4.     Specifically, shortly after HERA was passed, the Government designed and implemented a secret plan to take over the Companies from their shareholders.  Treasury hired Wall Street investment firm Morgan Stanley to provide a financial basis for taking over the Companies ███████████████████████████████████████████████████ ███████████."  Unsurprisingly, Morgan Stanley's analysis concluded, as the Government had asked it to conclude, that the Companies needed to be taken over.

5.     After working in secret to create a false basis for the takeover of Fannie Mae and Freddie Mac, the Government then constructed a public narrative that it was "rescuing"

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

desperately under-capitalized companies so that it would appear that the statutory basis allowing it to seize control of the Companies through conservatorships had been triggered.  This justification required delicate manipulation of the facts, particularly since in the days and months leading up to the imposition of the conservatorships, the Government had consistently acknowledged that the Companies were in compliance with capital requirements—including as late as August 22, 2008, just two weeks before the takeover, when FHFA provided each of the Companies with a "Notice of Proposed Capital Classification," acknowledging that they were each adequately capitalized and met all relevant capital requirements.

6.      The startling reversal of the Government's position, on September 4, 2008, just thirteen days after the FHFA's Notice of Proposed Capital Classification acknowledging that each of the Companies was adequately capitalized, when the FHFA suddenly changed course and sent letters to each of the Companies withdrawing its August 22, 2008 classifications, was not the result of real concerns with the Companies.  Instead it was the beginning of the Government's elaborate scheme to justify the takeover of Fannie Mae and Freddie Mac, by suddenly raising "critical concerns" regarding purported capital shortfalls, mismanagement by the Companies' officers and directors, and purported questions regarding Freddie Mac's accounting.  These purported "critical concerns" had no basis in fact and were directly contradicted by the FHFA's August 22, 2008 letters, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████.

7.      After laying this groundwork so that it had a purported justification to use them to prop up other parts of the economy, on September 6, 2008, the Government seized permanent control of the Companies and diverted their assets from common shareholders and preferred

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

shareholders to the Government.  When the FHFA placed the Companies into conservatorship, none of the statutory grounds for doing so under HERA were satisfied, and the Government knew this.  FHFA was only permitted to impose a conservatorship if one of more than twelve specifically enumerated grounds was present.  One of the grounds supporting conservatorship was that the Companies' boards of directors had consented to it.  FHFA, realizing that none of the other eleven grounds for conservatorship existed, all of which were based on the financial conditions of the Companies, contended that it had obtained "consent" from each Company's board of directors.  But the consent of the boards was obtained under tremendous duress and through threats and misrepresentations made by the Government, thus rendering any such "consent" legally invalid.  None of the other statutory grounds existed either:  at all relevant times leading up to and including the FHFA's decision to place the Companies in conservatorship, Fannie Mae and Freddie Mac were capable of meeting all of their obligations to all creditors, were operating in a safe and sound manner in accordance with all applicable legal requirements, were reporting financial statements in accordance with generally accepted accounting principles ("GAAP"), had adequate capital that exceeded all applicable regulatory requirements, and were capable of absorbing any losses that they might reasonably incur as a result of the downturn in the financial markets.

8.      Knowing that it lacked the proper authority to impose the conservatorships, the Government thereafter sought to convince the public that, in the national interest, its "rescue" had been necessary.  As part of its takeover of the Companies, FHFA had them enter into PSPAs which required that, in exchange for the Treasury's commitment to provide capital as might be needed—originally up to $100 billion to each Company—Fannie Mae and Freddie Mac each had to issue to the Treasury $1 billion in senior preferred stock with a cumulative 10% coupon,

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

payable quarterly, which would increase to 12% in the event of a missed dividend payment.  In addition, each Company issued to the Treasury common stock warrants representing a 79.9% ownership stake, at a nominal exercise price of $0.00001 per share with warrant duration of 20 years.  Further, in the event that the Companies had any capital shortages requiring them to borrow from the Treasury, such borrowings could not be repaid later.  Instead, borrowing from the Treasury would subject the Companies to an annual 10% interest rate on the total borrowings *forever*.  Essentially, the Government received almost 80% of the common equity for nothing, while the Companies were given no realistic way to emerge from the "conservatorships."

9.     To further its "rescue" narrative, upon announcing the conservatorships, the Government stated that, while every other financial institution was taking mortgage debt off its books, the Companies would *increase* their mortgage holdings and exposure.  FHFA Director James Lockhart stated that the "Enterprises will be allowed to grow their guarantee [mortgage-backed security] books without limits and continue to purchase replacement securities for their portfolios, about $20 billion per month without capital constraints."  Thus, while other prudently operated financial institutions were retreating from their positions in the market to minimize further losses and preserve shareholder value during this difficult financial time, the Government required Fannie Mae and Freddie Mac to do the exact opposite.  They were forced, under the Government's control, to assume more risky assets and increase their overall exposure to additional, future losses by guaranteeing even more mortgage-backed securities.  This was in fact the Government's true purpose and motivation for the nationalization of Fannie Mae and Freddie Mac.  It had realized that these shareholder-owned Companies could be used as an effective platform to provide critical support to other financial institutions and thereby facilitate the Government's public policy objectives aimed at shoring up the nation's economy during a period

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

of severe financial turmoil.  To wit, the FHFA-OIG found that "since September 2008, the private sector has almost entirely abandoned the secondary mortgage market," while Fannie Mae and Freddie Mac "have stepped up to fill the void."  In order to do this, however, the Government had to take control of Fannie Mae and Freddie Mac from their shareholders.

10.     As if saddling the Companies with enormous dividend payments to Treasury and then requiring them to increase holdings in risky asserts weren't enough, the Government also used its control over the Companies to force Fannie Mae and Freddie Mac to adopt unwarranted and improper accounting policies.  These policies, which violated GAAP, caused the Companies to inappropriately recognize massive non-cash expenses and write-downs that produced "paper losses" creating the appearance of massive capital shortfalls.  At the time they were placed in conservatorship, neither of the Companies required any capital to fund their operations, and could have easily paid their expenses and losses from cash flow and available assets.  However, the improper accounting policies and huge, unreasonable write-down of their deferred tax assets, *forced them to borrow more than $187 billion from Treasury—an amount which could never be repaid even if they generated the cash flow to repay it, which they ultimately did, and would therefore subject them to the extortionate 10% interest rate indefinitely*.  Thus, these improper accounting policies extracted a contractually-mandated *permanent* annuity payment of $18.7 billion per year from the Companies that would otherwise have been paid to shareholders as dividends.

11.     The FHFA, continuing the Government's policy of eliminating all shareholder value in the Companies and perpetuating the false narrative of their financial distress, forced Fannie Mae and Freddie Mac to substantially increase their loan loss reserves and unnecessarily reduce the value of their applicable deferred tax assets.  After the conservatorships were imposed,

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. *See*

FHFA00057820.  This was done largely to absorb the additional risk exposure caused by the Government instructing the Companies to take on more subprime assets and guarantee more MBS at the height of the financial crisis.  It also created the appearance that the Companies were less adequately capitalized than was actually the case, which further fostered the inaccurate perception that the Companies needed large amounts of additional capital going forward—capital that the Treasury was only too willing to provide in exchange for enormous, cumulative dividend payments made pursuant to a predatory lending arrangement that benefited the Government and the public, but destroyed the private property interests of the Companies' outstanding preferred and common shareholders.  By 2012, after roughly four years of being under the Government imposed conservatorships, the Companies collectively had drawn $187 billion from Treasury, $161 billion of which was solely on account of FHFA's decision to force the Companies to massively write-down the value of their assets.

12.     Despite the Government's repeated and misleading characterization of the takeovers as necessary to "rescue" Fannie Mae and Freddie Mac, in reality the Government used the Companies to rescue *other* financial institutions deemed "too big to fail."   While the Government falsely claimed that it was saving the Companies from financial collapse at enormous risk to taxpayers, the Government has reaped a windfall of tens of billions of dollars from its unjustifiable takeover of Fannie Mae and Freddie Mac.  In fact, this enormous windfall has been used to supplement the federal budget in other key areas, and the Government has become loathe to give up this prime source of revenue.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

13.    At the same time, the Government destroyed the critical rights of the Companies' shareholders and the value of shareholder ownership interests in the Companies' securities, effectively nationalizing what were once shareholder-controlled corporations and trampling the private ownership rights and property interests of the shareholders who owned these publicly-traded companies.   As the Financial Crisis Inquiry Commission ("FCIC") bluntly concluded, "[e]xisting common and preferred shareholders were effectively wiped out" by the Government's actions.

14.    Even in the middle of an unprecedented financial crisis, the Government cannot legally convert property rights for its own ends without providing just compensation, even if the Government's "ends" are designed to provide a public benefit.   The Fifth Amendment of the United States Constitution provides that the Government shall not deprive any person of "property without due process of law" and prohibits the Government from appropriating private property for public use "without just compensation."

15.    Prior to the appointment of the FHFA as conservator, Fannie Mae and Freddie Mac were owned and controlled by their shareholders.   Much of the common stock was owned by "Mom and Pop" retail investors and public pension funds, while much of the preferred stock was owned by institutional investors, whom the Government had encouraged to purchase these shares. The Government had created strong incentives for banks and other institutions like plaintiff Washington Federal to buy Fannie Mae and Freddie Mac preferred stock, including beneficial capital treatment and beneficial tax treatment.   Before the conservatorships were imposed, the total market value of all outstanding shares of common stock of the Companies was over $10 billion, and the total redemption value of all outstanding shares of preferred stock of the Companies was more than $35 billion.   As a result of the Government's actions challenged in this case, the value

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

of both the common and preferred stock in the Companies was largely eliminated and the rights of these shareholders were eviscerated.

16.     The actions taken by the Government to place Fannie Mae and Freddie Mac into conservatorship expropriated the Companies' common and preferred shareholders' rights and the value of their equity in the Companies without due process, and without just compensation, thereby constituting an impermissible exaction and/or taking in violation of the Fifth Amendment to the United States Constitution.

## II.     PARTIES

17.     Plaintiff Washington Federal was, at all relevant times, a preferred shareholder of both Fannie Mae and Freddie Mac.  Washington Federal is a subsidiary of Washington Federal, Inc., and is headquartered in Seattle, Washington.

18.     Plaintiff Michael McCredy Baker was, at all relevant times, a preferred shareholder of both Fannie Mae and Freddie Mac.

19.     Plaintiff City of Austin Police Retirement System was, at all relevant times, a common shareholder of both Fannie Mae and Freddie Mac.

20.     Defendant United States of America includes the Federal Housing Finance Agency and its agents acting at its direction and the United States Treasury and its agents acting at its direction.

## III.     JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1491(a) and 2501.

22.     Venue is proper under 28 U.S.C. § 1491(a).

## IV.     RELEVANT CONSTITUTIONAL PROVISION

23.     Plaintiffs' claims are governed by the "Takings" clause of the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

of life, liberty, or property, without due process of law; *nor shall private property be taken for public use, without just compensation*." (Emphasis added.)

## V.    FACTUAL BACKGROUND[1]

### A.    History of Fannie Mae and Freddie Mac

#### 1.    Creation of Fannie Mae and Freddie Mac

24.    For decades, Fannie Mae and Freddie Mac have guaranteed the vast majority of all new home mortgages in the United States.  During the 2008 financial crisis, they suffered losses, like virtually every other financial institution at the time.  These losses stemmed largely from investments the Companies made at the Government's insistence in the years leading up to, and at the outset of, the 2008 financial crisis.  The Government encouraged the Companies to make these investments to accomplish its goals of increasing liquidity in the mortgage market and shoring up the nation's struggling economy.  Despite these losses, however, the Companies remained adequately capitalized at all relevant times.

25.    Fannie Mae was first established by federal statute in 1938 to provide increased liquidity to the nation's home mortgage market.  For 30 years thereafter, the Company was operated by the Government.  In 1968, however, Fannie Mae was privatized pursuant to the Housing and Urban Development Act of 1968.  By that time, Congress was loathe to keep Fannie

---

[1] This Factual Background is based, in part, on jurisdictional discovery produced in *Fairholme Funds, Inc. v. United States*, No. 13-465C, which the Court ordered because the *Fairholme* plaintiffs had shown that such discovery could "disclose evidence relevant to the disputed factual issues about Fannie and Freddie's solvency and the reasonableness of expectations about their future profitability, as well as provide answers related to why the government allowed the preexisting capital structure and stockholders to remain in place, and whether this decision was based on the partial expectation that Fannie and Freddie would be profitable again in the future." *Fairholme* Dkt No. 32.  As such, the discovery was focused on the Government's justifications for the Third Amendment, rather than the conservatorships themselves.  Plaintiffs' citations to documents and testimony from the *Fairholme* record should not be interpreted as an admission that discovery necessary to prove their claims is complete.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Mae's debt included in public debt figures, as the Vietnam War was taking an alarming toll on those same figures.  To ease that burden, Congress reorganized the Company as a government-sponsored enterprise ("GSE")—a federally chartered private corporation that was charged with serving the self-supporting mortgage market.  In so doing, Congress transferred the ownership of Fannie Mae to its new private shareholders, enabling the Company to raise capital from the private capital markets and operate much like any other publicly traded, shareholder-owned company while still accomplishing its mission by purchasing mortgages from primary mortgage lenders, purchasing and issuing MBS, and providing guarantees for certain privately owned MBS.

26.     Beginning in 1968, and continuing until June of 2010, Fannie Mae was publicly traded on the New York Stock Exchange (Symbol:  FNM), and was therefore owned by private shareholders.   It regularly obtained funding from private capital on a self-sustaining basis. Immediately prior to the imposition of the conservatorship over it in September 2008, Fannie Mae had more than 597 million preferred shares (in 17 different series with a total redemption value of roughly $21 billion), and it also had over one billion shares of common stock outstanding with an approximate market value in excess of $7 billion.

27.     Freddie Mac was established in 1970 by the Emergency Home Finance Act to create a secondary market for conventional mortgages.  In 1989, Freddie Mac was reorganized under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").  Under FIRREA, Freddie Mac was restructured in a manner similar to Fannie Mae, *i.e.*, a for-profit corporation owned by private shareholders.

28.     From 1984 until June of 2010, Freddie Mac was publicly traded on the New York Stock Exchange (Symbol:  FRE), and was therefore owned by private shareholders.  It regularly obtained funding from private capital on a self-sustaining basis.   Immediately prior to the

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

imposition of the conservatorship over it in September 2008, Freddie Mac had more than 464 million preferred shares (in 24 different series with a total redemption value of roughly $14 billion), and it also had approximately 650 million shares of common stock outstanding with an approximate market value of $3.3 billion.

29.    Although the Companies were charged with a public mission, they operated successfully for decades on capital raised from investors through the private capital markets, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.  In fact, the first page of Fannie Mae's quarterly report for the period ended June 30, 2008, as filed with the SEC on Form 10-Q, describes Fannie Mae as "a government-sponsored enterprise ('GSE'), owned by private shareholders (NYSE: FNM) and chartered by Congress to support liquidity and stability in the secondary mortgage market."

30.    As with any other publicly traded company, owners of Fannie Mae and Freddie Mac stock were vested with specific rights attendant to their ownership.  These rights were specifically enumerated in each Company's by-laws and the prospectuses and registration statements for each of the Companies' common stock and series of preferred stock.

31.    The by-laws and offering documents for Fannie Mae's and Freddie Mac's common stock enumerated specific rights held by each Company's common shareholders, and these rights were typical of those rights usually associated with the private property interest represented by common stock in a shareholder-owned company.  For example, these included the right of the Companies' common shareholders to transfer their shares of stock and to vote for candidates for these Companies' boards of directors and shareholder proposals.  The owners of Fannie Mae's and Freddie Mac's common stock also had the right to receive a portion of the Companies' assets in the event of dissolution or liquidation.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

32.     The offering documents for Fannie Mae's preferred stock enumerated specific rights held by its preferred shareholders typical of those rights often held by preferred stockholders in a shareholder-owned company.  For instance, these shares were transferrable.  Likewise, the offering circular for Fannie Mae's Series T preferred shares, like numerous other series of its preferred stock offerings, indicated that holders of those shares would have the right to receive a portion of the Company's assets in the event of dissolution or liquidation.  In addition, Fannie Mae preferred shareholders had the right to vote on amendments to their series' certificate of designation, subject only to narrow exceptions.

33.     Similarly, the offering documents for Freddie Mac's preferred stock enumerated specific rights held by its preferred shareholders typical of those rights often held by preferred stockholders in a shareholder-owned company.  For instance, these shares of preferred stock were transferrable.  Likewise, the offering circular for Freddie Mac's Series Z preferred shares, like numerous other series of its preferred stock offerings, indicated that holders of those shares would have the right to receive a portion of the Company's assets in the event of dissolution or liquidation. In addition, Freddie Mac preferred shareholders had the right to vote on amendments to their series' certificate of designation, subject only to narrow exceptions.

**2.      The Success of Fannie Mae and Freddie Mac with Investors**

34.     Private investors long considered Fannie Mae and Freddie Mac securities to be popular, sound, conservative investments.  In fact, even as late as August 7, 2008, Fannie Mae's preferred stock was rated "AA-" by S&P, "A1" by Moody's and "A+" by Fitch.

35.     The financial stability of the Companies and the popularity, transferability and soundness of the Companies' securities, prior to the conservatorships, were clearly evidenced by, among other factors, the extent to which these shares were traded on the open market.  For example, during the three years before Fannie Mae was placed into conservatorship, *i.e.*, from

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

September 5, 2005, through September 5, 2008, Fannie Mae's common stock had an average daily trading volume of more than 13 million shares. Likewise, during the same time period, Freddie Mac's common stock had an average daily trading volume of more than 12 million shares.

36.    Moreover, at the time the conservatorship was imposed, Fannie Mae had 17 series of preferred stock outstanding. These series of preferred stock were overwhelmingly popular and allowed the Company to easily raise substantial capital in the private capital markets, as follows:

**Fannie Mae Preferred Shares Outstanding As of Date of Conservatorship**

| Series | Rate | CUSIP | Date | Shares | Redemption Value per Share | Total Redemption Value |
|--------|------|-------|------|--------|---------------------------|------------------------|
| D | 5.250% | 313586505 | 09/30/98 | 3,000,000 | 50.00 | $150,000,000 |
| E | 5.100% | 313586604 | 04/15/99 | 3,000,000 | 50.00 | 150,000,000 |
| F | Variable | 313586703 | 03/20/00 | 13,800,000 | 50.00 | 690,000,000 |
| G | Variable | 313586802 | 08/08/00 | 5,750,000 | 50.00 | 287,500,000 |
| H | 5.810% | 313586885 | 04/06/01 | 8,000,000 | 50.00 | 400,000,000 |
| I | 5.375% | 313586877 | 10/28/02 | 6,000,000 | 50.00 | 300,000,000 |
| L | 5.125% | 313586844 | 04/29/03 | 6,900,000 | 50.00 | 345,000,000 |
| M | 4.750% | 313586836 | 06/10/03 | 9,200,000 | 50.00 | 460,000,000 |
| N | 5.500% | 313586828 | 09/25/03 | 4,500,000 | 50.00 | 225,000,000 |
| O | Variable | 313586794 | 12/30/04 | 50,000,000 | 50.00 | 2,500,000,000 |
| 2004-1 | 5.375% | 313586810 | 12/30/04 | 25,000 | 100,000.00 | 2,500,000,000 |
| P | Variable | 313586786 | 09/28/07 | 40,000,000 | 25.00 | 1,000,000,000 |
| Q | 6.750% | 313586778 | 10/04/07 | 15,000,000 | 25.00 | 375,000,000 |
| R | 7.625% | 313586760 | 11/21/07 | 21,200,000 | 25.00 | 530,000,000 |
| S | Variable | 313586752 | 12/11/07 | 280,000,000 | 25.00 | 7,000,000,000 |
| 2008-1 | 8.750% | 313586745 | 05/14/08 | 41,696,401 | 50.00 | 2,084,820,050 |
| T | 8.250% | 313586737 | 05/19/08 | 89,000,000 | 25.00 | 2,225,000,000 |

             **Totals**                        **597,071,401**             **$21,222,320,050**

37.    Likewise, at the time the conservatorship was imposed, Freddie Mac had 24 series of preferred stock outstanding. These series of preferred stock were overwhelmingly popular and allowed the Company to easily raise substantial capital in the private capital markets, as follows:

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

**Freddie Mac Preferred Shares Outstanding As of Date of Conservatorship**

| Series | Rate | CUSIP | Date | Shares | Redemption Value per Share | Total Redemption Value |
|---|---|---|---|---|---|---|
| B | Variable | 313400608 | 04/26/96 | 5,000,000 | 50.00 | $250,000,000 |
| Not Listed | 5.81% | 313400889 | 10/27/97 | 3,000,000 | 50.00 | 150,000,000 |
| F | 5.00% | 313400863 | 03/23/98 | 8,000,000 | 50.00 | 400,000,000 |
| G | Variable | 313400848 | 03/23/98 | 4,395,000 | 50.00 | 219,750,000 |
| H | 5.10% | 313400855 | 09/23/98 | 8,000,000 | 50.00 | 400,000,000 |
| Not Listed | 5.30% | 313400822 | 10/28/98 | 4,000,000 | 50.00 | 200,000,000 |
| Not Listed | 5.10% | 313400814 | 03/19/99 | 3,000,000 | 50.00 | 150,000,000 |
| K | 5.79% | 313400830 | 07/21/99 | 5,000,000 | 50.00 | 250,000,000 |
| L | Variable | 313400798 | 11/02/99 | 5,750,000 | 50.00 | 287,500,000 |
| M | Variable | 313400780 | 01/26/01 | 6,500,000 | 50.00 | 325,000,000 |
| N | Variable | 313400764 | 03/23/01 | 4,600,000 | 50.00 | 230,000,000 |
| O | 5.81% | 313400772 | 03/23/01 | 3,450,000 | 50.00 | 172,500,000 |
| P | 6.00% | 313400749 | 05/30/01 | 3,450,000 | 50.00 | 172,500,000 |
| Q | Variable | 313400756 | 05/30/01 | 4,025,000 | 50.00 | 201,250,000 |
| R | 5.70% | 313400731 | 10/30/01 | 6,000,000 | 50.00 | 300,000,000 |
| Not Listed | 5.81% | 313400723 | 01/29/02 | 6,000,000 | 50.00 | 300,000,000 |
| S | Variable | 313400715 | 07/17/06 | 15,000,000 | 50.00 | 750,000,000 |
| T | 6.42% | 313400699 | 07/17/06 | 5,000,000 | 50.00 | 250,000,000 |
| U | 5.90% | 313400681 | 10/16/06 | 20,000,000 | 25.00 | 500,000,000 |
| V | 5.57% | 313400673 | 01/16/07 | 44,000,000 | 25.00 | 1,100,000,000 |
| W | 5.66% | 313400665 | 04/16/07 | 20,000,000 | 25.00 | 500,000,000 |
| X | 6.02% | 313400657 | 07/24/07 | 20,000,000 | 25.00 | 500,000,000 |
| Y | 6.55% | 313400640 | 09/28/07 | 20,000,000 | 25.00 | 500,000,000 |
| Z | 8.38% | 313400624 | 12/04/07 | 240,000,000 | 25.00 | 6,000,000,000 |

**Totals**                                   **464,170,000**            **$14,108,500,000**

**3.      The Housing and Community Development Act of 1992 and the Government's Confidence in the Financial Health of the Companies**

38.     In 1992, Congress enacted the Federal Housing Enterprises Financial Safety and Soundness Act as Title XIII of the Housing and Community Development Act, Pub. L. No. 102-550, 102 Stat. 3672 (1992) (the "1992 Act"). Section 1302 of the 1992 Act included Congress'

- 15 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

findings that Fannie Mae and Freddie Mac "currently pose low financial risk of insolvency" and noted the need for a regulatory entity for the Companies that "should have the authority to establish capital standards, require financial disclosure, prescribe adequate standards for books and records and other internal controls, conduct examinations when necessary, and enforce compliance with the standards and rules that it establishes . . . ."

39.    Section 1311 of the 1992 Act also established OFHEO ("Office of Federal Housing Enterprise Oversight") as an agency within the Department of Housing and Urban Development ("HUD") to serve as the Companies' chief regulator.

40.    In addition, the 1992 Act amended the Companies' charters, requiring them to meet an "affirmative obligation to facilitate the financing of affordable housing for low-income and moderate-income families." HUD was designated as the Companies' affordable housing mission regulator.

41.    The 1992 Act established capital standards for the Companies and gave OFHEO authority to conduct routine safety and soundness examinations of Fannie Mae and Freddie Mac and to take enforcement actions. The various enforcement actions available to the OFHEO Director included the authority to place either Company into conservatorship under certain prescribed circumstances.

### 4.    The Companies Had Never Previously Warranted Conservatorship

42.    In January 2003, Freddie Mac announced that it would need to restate its earnings for 2002, 2001, and 2000 because its new auditor had discovered accounting practices that were not in conformance with GAAP. Pursuant to a consent order with OFHEO, Freddie Mac's board of directors retained an outside law firm to investigate. The investigation uncovered numerous irregularities. In December 2003, OFHEO published an extensive report on the outside investigation, detailing a number of findings indicating mismanagement and improper accounting

- 16 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

practices.  Even though the Company paid a civil penalty to OFHEO and agreed to take corrective measures specified by the agency, this situation was not deemed sufficient to legally invoke the conservatorship authority established in the 1992 Act.

**B.**    **As the Financial Crisis Worsened, the Government Weakened the Companies' Financial Strength by Causing Them to Increase Their Exposure to Riskier Investments, Although to a Far Lesser Degree than Other Financial Institutions at the Time**

43.    Prior to the mortgage and financial crisis, Congress and OFHEO repeatedly exerted pressure on Fannie Mae and Freddie Mac to delve deeper into the subprime and Alt-A mortgage market.  As Senator Jack Reed (D-RI) told Fannie Mae's then-CEO, Daniel Mudd, at a Congressional hearing in 2006, "[w]hen homes are doubling in price in every six years and incomes are increasing by a mere one percent per year, Fannie's mission is of paramount importance."  Senator Reed insisted that, "[i]n fact, Fannie and Freddie can do more, a lot more."

44.    In August 2007, OFHEO directed Fannie Mae and Freddie Mac to apply the Statement on Subprime Mortgage Lending and the Interagency Guidance on Nontraditional Mortgage Product Risks—guidance statements resulting from, and issued by, a collaborative effort by federal banking regulatory agencies—to their purchases of private-label securities and subprime loans, including bulk purchases.  Upon the announcement that both companies had implemented these directives, James B. Lockhart, then-director of OFHEO (later director of the FHFA), commended the Companies, stating:  "These actions represent another significant step in promoting sound underwriting practices, enabling homeowners to select from prudent mortgage vehicles, and restoring confidence in the mortgage finance system."  He continued:  "I commend the Enterprises for their implementation of the directives. . . .  These actions, which address the practices of both regulated and unregulated mortgage originators, reinforce the historic and statutory role of Fannie Mae and Freddie Mac in promoting market liquidity through

- 17 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

standardization of mortgage underwriting. . . .  Such safe and sound underwriting practices serve the interests of borrowers and lenders in promoting sustained homeownership."

45.     At the same time, Lockhart adjusted the Companies' lending standards so that they could purchase as much as $40 billion, combined, in new subprime loans.  Congressman Barney Frank, chairman of the House Financial Services Committee, voiced support for increased lending activity, stating:  "I'm not worried about Fannie and Freddie's health, I'm worried that they won't do enough to help out the economy. . . .  That's why I've supported them all these years."

46.     Faced with directives from Congress and agency regulators to accumulate subprime and Alt-A holdings, the Companies did so, but they still remained adequately capitalized.  As Fannie Mae's former CEO, Daniel Mudd, later explained, "Fannie Mae faced the danger that the market would pass us by. . . .  We were afraid that lenders would be selling products we weren't buying and Congress would feel like we weren't fulfilling our mission.  The market was changing, and it's our job to buy loans, so we had to change as well."  As Secretary Geithner acknowledged in 2000, ███████████████████████████████████████

███████████████████████████████████████████████████████

UST00479918.

47.     On March 19, 2008, OFHEO further exacerbated the Companies' accumulation of high risk holdings by easing their capital restraints from 30% to 20 in exchange for the Companies' agreement to raise "significant capital" at an indeterminate point in the future.  After Fannie Mae raised $7.4 billion, OFHEO further lowered the capital surcharge from 20% to 15%.  ████████

███████████████████████████████████████████████████████

UST00037193, at pg. 19, -37211.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

48.     The vast majority of subprime mortgages—the loans at the heart of the crisis—were underwritten by unregulated private firms.  These were lenders who sold the bulk of their mortgages to Wall Street, not to Fannie Mae or Freddie Mac.  Private securitizers—competitors of Fannie Mae and Freddie Mac—grew from 10% of the market in 2002 to nearly 40% in 2006. As a percentage of all mortgage-backed securities, private securitization grew from 23% in 2003 to 56% in 2006.  Accordingly, the relative market share of Fannie Mae and Freddie Mac dropped from a high of 57% of all new mortgage originations in 2003, down to 37% as the bubble was developing in 2005-06.  More than 84% of the subprime mortgages in 2006 were issued by private lending institutions.

49.     Prior to the mortgage crisis, Freddie Mac suffered a serious delinquency rate of 0.42% on single-family home mortgages as of December 31, 2006.  This figure climbed to 0.65% as of December 31, 2007, to 1.72% as of December 31, 2008 and to 3.87% as of December 31, 2009.  Similarly, Fannie Mae suffered a serious delinquency rate of 0.65% as of December 31, 2006.  This figure climbed to 0.98% as of December 31, 2007, to 2.42% as of December 31, 2008 and to 5.38% as of December 31, 2009.  These rates compare quite favorably to the national averages for serious delinquencies of prime loans reported by the National Delinquency Survey from the Mortgage Bankers Association:  2.21% as of December 31, 2006, 3.62% as of December 31, 2007, 5.17% as of December 31, 2008 and 6.84% as of December 31, 2009.  The default rates of subprime loans were markedly higher still.

50.     Despite the Government's ill-advised policies, the Companies had less exposure to toxic mortgages than many other financial institutions, and they did not have significant amounts of risky mortgage debt on their books until 2006.  The Government has admitted that "delinquency

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

rates on many PLS [private-label securities] and other loans held by banks and other private market institutions were far higher than on the loans held by Fannie Mae and Freddie Mac."

**C.     Congress Passed the Housing and Economic Recovery Act of 2008 to Allow the Government to Impose Conservatorships Over the Companies if Certain Criteria Were Satisfied**

51.     On July 24, 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), which contemplated replacing OFHEO with the FHFA, and also created express authority to force the Companies into conservatorship or receivership under certain enumerated conditions.

52.     During the legislative process prior to enacting HERA, members of Congress repeatedly emphasized the financial health and viability of both Fannie Mae and Freddie Mac, expressly rejecting the notion that a conservatorship would ever be imposed on either Company. Treasury Secretary Paulson acknowledged FHFA's conservatorship and receivership powers, stating that regulators needed "a bazooka" at their disposal, but assured Senators that there was little likelihood that this "bazooka" would ever be used.

53.     In support of the bill, Senator Isakson (R-GA) further explained:

> The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans. ***It is an infusion of confidence the financial markets need.***  Fannie and Freddie suffer by perception from the difficulties of our mortgage market. ***If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.***  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing that problem.  That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae.  ***They have $50 billion in capital, when the requirement is to have $15 billion, so they are sound.***  But the financial markets, because of the collapse of the mortgage market, have gotten worse.
>
> You might say:  What does all this mean?  What it means is we will put liquidity back into the mortgage market.  There will be good underwriting and accountable credit issued by the mortgages that are

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

then sold to Freddie Mac and Fannie Mae to provide the liquidity in the marketplace. This is not a bailout for those two institutions. It is an insurance policy that the credit markets will understand that, A, those institutions are strong and the United States is going to hold them accountable and, B, provide them with liquidity when they need it. That is good for this country and this economy, and it would be a tragedy if tomorrow this Senate doesn't overwhelmingly embrace that legislation. [Emphasis added.]

154 Cong. Rec. S7436-01 (2008).

54.     Much like the positive statements made by members of Congress with the passage of HERA, in the months preceding the imposition of the Conservatorship, Government officials acknowledged the adequate capitalization of the Companies on numerous occasions, including the following:

a)  a June 9, 2008 News Release issued by OFHEO stating that the Director "classified Fannie Mae and Freddie Mac as adequately capitalized as of March 31, 2008," and that the Companies were maintaining "overall capital levels well in excess of the requirements." UST00037193.

b)  the July 10, 2008 testimony of Federal Reserve Chairman Ben Bernanke before the House Financial Services Committee that Fannie Mae and Freddie Mac were both "adequately capitalized."

c)  the July 10, 2008 testimony of Secretary Paulson to the House Banking Committee that OFHEO "has made clear that [Fannie Mae and Freddie Mac] are adequately capitalized."

d)  the July 10, 2008 News Release issued by the OFHEO Director in which he stated: "As I have said before, they [Fannie Mae and Freddie Mac] are adequately capitalized, holding capital well in excess of the OFHEO-directed requirement,

- 21 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

which exceeds the statutory minimums.  They have large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets."

e)  Secretary Paulson's July 15, 2008 testimony to the Senate Banking Committee confirming the adequacy of the Companies' capitalization.

f)  A July 15, 2008, message 

that stated:

FHFA00065630-65631 (emphasis added).

g)  A July 22, 2008 email to Treasury officials 

FHFA00064783.  He repeated this in another message two days later,

FHFA00065367 (emphasis added).

h)  A July 30, 2008, conference call

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

███████████████████████████████████████████

████████████████████████████ UST00337442-373443.

55.    On August 22, 2008, FHFA sent a "Notice of Proposed Capital Classification" letter to Richard Syron (CEO of Freddie Mac) announcing that FHFA had "determined that Freddie Mac's core capital exceeds the FHFA-directed minimum capital requirement, as well as the statutory minimum capital requirement."

56.    Also on August 22, 2008, FHFA sent a similar "Notice of Proposed Capital Classification" letter to Daniel Mudd (President and CEO of Fannie Mae) providing "Fannie Mae with notice that the proposed capital classification of Fannie Mae is adequately capitalized at June 30, 2008."

57.    As late as September 4, 2008, news reports acknowledged that ████████████ █████████████████████████████████████████████████████████████████████████

UST00497064.

**D.    While Stating Publicly that the Criteria For Conservatorship Were Not Satisfied, the Government Planned in Secret to Seize the Companies Regardless of Their Financial Condition**

58.    While saying publicly, until just days before the sudden and dramatic reversal of its position, that the Companies were adequately capitalized and that the "bazooka" of conservatorship would not need to be used, behind the scenes the Government was secretly creating a severely overstated record to justify seizing control of them. By September 1, 2008, the Government had decided to impose the conservatorships imminently.   But the purported justification for its decision was significantly undermined by the recent, August 22, 2008 FHFA letters opining that each of the Companies was adequately capitalized, which stood in stark contrast to the grounds necessary to force the Companies into conservatorships under HERA.   Recognizing this serious contradiction, FHFA abruptly reversed course ██████████████████████████

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

███████████████████████████████████████████████████

████████ UST00528009, at UST00528143-44.

59.    Shortly thereafter ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

60.    In addition ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████.

61.    The financial basis for claiming capital deficits at each of the Companies had been developed under highly secretive conditions with assistance from Wall Street investment firm Morgan Stanley.  UST00530312 ███████████████████████████████).  Morgan Stanley's misleading calculations were directly contradicted by the FHFA's letters of August 22, 2008 (just 13 days earlier) acknowledging that both Fannie Mae and Freddie Mac were "adequately capitalized."  Aug. 22, 2008 Letter to Mudd; Aug. 22, 2008 Letter to Syron.   The Morgan Stanley ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

(Emphasis added.)

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

62.   Perhaps most revealing, the truth of the Government's pretext for imposition of the conservatorships was disputed by FHFA's own chief accountant, Wanda DeLeo, in a September 8, 2008, meeting with Freddie Mac's auditor Price Waterhouse Cooper ("PwC").  At this meeting, Ms. DeLeo ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

63.   Ms. DeLeo further acknowledged that Morgan Stanley ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████

## E.   The Government Seized Control of the Companies, Falsely Portraying the Conservatorships as a Rescue Operation

### 1.   The Conservatorships

64.   Despite the subsequent acknowledgment by FHFA's chief accountant that the Companies' financial statements at the time were compliant with GAAP, Government officials had decided to impose conservatorships upon Fannie Mae and Freddie Mac, come hell or high water.  As Secretary Paulson told President Bush at the time, "[w]e're going to move quickly and take them by surprise. The first sound they'll hear is their heads hitting the floor."

65.   On September 5, the day after the Companies received the September 4 Letters, the Government held meetings with the Companies during which they were presented with the "facts" that purportedly supported the imposition of the conservatorships.   Those "facts" had been developed in secrecy, even as officials at every level of the Government were making assurances

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

to the public that both Fannie Mae and Freddie Mac were financially sound, which were in fact true when they were made as demonstrated by the facts that have subsequently come out.

66.     Two days later, on September 7, 2008, less than two months after the enactment of HERA, FHFA Director Lockhart and Treasury Secretary Paulson blindsided the Companies and their shareholder owners by placing the Companies into conservatorship and taking control away from the shareholders.  In support of this action they cited both Companies' purported financial troubles.  In a prepared statement, Paulson misleadingly stated that "[b]ased on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form."

67.     Similarly, in his September 7, 2008, statement announcing this unprecedented Government action, Lockhart misleadingly stated that "[t]he Boards of both companies consented yesterday to the conservatorship."  However, the board's "consent" was by no means voluntary. On the contrary, it was obtained through intimidation and coercion by the Government, and the boards of directors at the Companies were not given any real choice.  Instead, the conservatorships were presented to the Companies as a take-it-or-leave-it proposition with no alternative option. The Government made it clear to all concerned that it would take control of the Companies regardless of whether their boards of directors consented to the conservatorships, thereby leaving them no real choice. In effect, they were forced to consent.

**2.     The Preferred Stock Purchase Agreements ("Purchase Agreements")**

68.     Executing on its plan to eliminate all private interests in the Companies, on September 7, 2008, Treasury entered into Preferred Stock Purchase Agreements with both Fannie Mae and Freddie Mac.  While the Companies did not require the capital infusions provided for in

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

those agreements, entering into the agreements helped to further convince the public that the conservatorships were necessary to "rescue" the Companies and provide them with purported financial assistance.  In reality, the Government was using the Companies as a platform to achieve other public policy objectives aimed at supporting the nation's economy by warehousing toxic debt from other troubled, critical financial institutions.  In so doing, the Government placed Fannie Mae and Freddie Mac in a never-ending cycle of borrowing from the Treasury merely to pay the dividends required by the Purchase Agreements, which were designed to ensure, along with the subsequent Third Amendment to these agreements, that Fannie Mae and Freddie Mac could never return to their former status as shareholder-controlled corporations.

69.    The terms of the Purchase Agreements initially allowed each Company the right to draw up to $100 billion from Treasury to ensure that the Company's assets exceeded its liabilities (the "Treasury Commitment").  In return, Treasury received from each Company, *inter alia*: (a) shares of a new class of preferred stock valued at $1 billion, which value would increase dollar-for-dollar when (and if) the Company actually drew funds from the Treasury pursuant to the Treasury Commitment; (b) the right to receive a quarterly dividend on this preferred stock; and (c) warrants allowing Treasury to purchase 79.9% of each Company's common stock at nominal prices.

70.    In fact, Grant Thornton LLC, the financial consultant firm hired by Treasury after the conservatorships were implemented to estimate a value for the preferred stock held by the Government, had trouble valuing Treasury's stake in the Companies because it found that the terms of the PSPA actually had nothing to do with the Companies' financial solvency:



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER



FHFA00028624, at -28630.

71.     Even after the conservatorship, Freddie Mac management met to discuss amendments to the harsh terms of the PSPA ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ FHFA00091724, p. 3.

72.     This structure was publically portrayed as being designed to not disturb the rights of the large amounts of preferred stock issued by each Company.  Indeed, Secretary Paulson contemporaneously explained that "conservatorship does not eliminate the outstanding preferred stock." C.A. App. at 2439, No. 14-5243 (D.C. Cir. Feb. 16, 2016) (Doc. 1599039).  Likewise, the FHFA publically confirmed that the Companies' public shareholders would "continue to retain all rights in the stock's financial worth."  *Id.* at 2443.

73.     However, from the beginning of the conservatorships, the Government's intention and ultimate goal was never to restore the Companies to their shareholders, but rather to take a first step to "wind down" (*i.e.*, dissolve) the Companies, pending action by Congress:

- In an October 2008 speech, Chairman Bernanke agreed with Paulson that the conservatorships "can usefully be viewed as a "time out"--one that will give everyone involved, especially the Congress, the opportunity to reconsider the appropriate roles of Fannie and Freddie in the U.S. mortgage market." FHFA00005353, at -5354.

- ████████ ██████ █████ ██ ████ ███ ████ ███████ ████ █████████████████████████████████ █████████████████████████████████ █████████████████████████████████

- 28 -



- In a March 8, 2011 speech, by FHFA Acting Director Edward J. DeMarco, he admitted that:

  As conservator, FHFA stands in the shoes of the Enterprises' shareholders. Given the structure of Treasury's preferred stock purchase agreements with the Enterprises, the entity with the greatest economic interest in the Enterprises today is the taxpayer Thus, we are preserving and conserving the assets principally for taxpayers so that they may realize the greatest possible return from these assets, whatever the final form of the companies' transformation ends up being. **We do this with a clear expectation that Fannie Mae and Freddie Mac, as we have known them, will no longer exist.** But we do not know when, or in what fashion, this will happen. UST00531840, at -531850 (emphasis added).



- December 11, 2011 testimony by Halderman where he stated that "the terms of Freddie Mac's Preferred Stock Purchase Agreement with Treasury were explicitly designed to make it difficult if not impossible for [Freddie Mac] to emerge from conservatorship and for shareholders to recoup any value from their investments." Haldeman explained that the ten-percent dividend on funds received from the Treasury was "by design to

- 29 -

ensure that the [Companies] could not emerge from conservatorship and that shareholders would not benefit from federal support," and "necessitate[ed] additional requests for Treasury funds."

- 

- On August 17, 2012, in announcing the execution of the Third Amended Stock Agreements (the "Third Amendment"), Director DeMarco stated that the amendment merely reaffirmed the Government's Strategic Plan for the conservatorships of the Companies, including "gradually contracting their operations." FHFA Statement, *Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17, 2017).

74.    In May 2009, Treasury and the Companies (through FHFA as their conservator) entered into the First Amendment to the PSPAs.  This amendment increased the Treasury Commitment from $100 billion to $200 billion for each Company.

75.    Later in 2009, Treasury and the Companies (through FHFA as their conservator) entered into the Second Amendment to the PSPAs.  This amendment allowed each Company to draw unlimited sums from Treasury through 2012, and thereafter capped the Treasury Commitment at $200 billion per Company, in addition to the amounts already drawn.

76.    Subsequently, in August 2012, the Government amended the PSPAs for the third time (the "Third Amendment") to replace the existing requirement of quarterly dividend payments by the Companies to Treasury with a quarterly "sweep" of each Company's entire net worth to Treasury, regardless of the amounts actually owed by the Companies.

### F.    The Government's Imposition of the Conservatorships Improperly Appropriated the Private Property of the Companies' Preferred and Common Shareholders

77.    Under the terms of the conservatorships, the FHFA assumed the powers of the Companies' boards of directors and management, and the Companies' CEOs were dismissed.  It

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

terminated all shareholder meetings and all shareholder voting rights.  These Government actions caused the Companies' preferred and common stock values to plummet.  The common stock of Fannie Mae and Freddie Mac subsequently traded at less than $1.00 per share—down from over $7.04 per share and $5.10 per share, respectively, immediately prior to the imposition of the conservatorship.  Preferred shares of each of the Companies subsequently traded at roughly 2-15% of redemption value immediately following the imposition of the conservatorship.

78.     The placement of the Companies into conservatorship and the subsequent actions taken by the Government erased shareholder value and destroyed the rights and property interests of the Companies' preferred and common shareholders.   While the Government guaranteed payments on the Companies' outstanding debt instruments through financing agreements with the Treasury, the Companies were ordered to cease paying dividends on their preferred and common stock.  Although this stock would remain outstanding, on June 16, 2010, the FHFA ordered the Companies to delist their common and preferred shares from the New York Stock Exchange.  The loss of rights and value suffered by the Companies' shareholders on account of the Government's actions is noted in Fannie Mae's Form 10-K for the year ending December 31, 2011, issued under the FHFA's control:  "[b]ecause we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters.  The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to the Treasury) during the conservatorship, and we are no longer managed with a strategy to maximize shareholder returns."

79.     The Treasury department, as well as the Federal Deposit Insurance Corporation (FDIC), ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.  FHFA00004508.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

80.    In a November 2011 speech, Director DeMarco admitted the common stock value was destroyed by the conservatorships:

> [T]he Enterprises' equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims. As a practical matter, taxpayers are not likely to be repaid in full, so Enterprise stock lower in priority is not likely to have any value. Prior to conservatorship, much executive compensation, and indeed some staff compensation, was in the form of company stock, so the value of such compensation has essentially vanished. UST00078209, at -78211.

81.    On December 1, 2011, Freddie Mac's then-CEO, Charles Haldeman, testified before the Oversight Subcommittee of the House Financial Services Committee.  Haldeman testified that "Freddie Mac uses taxpayer funds to support the nation, not to enrich private shareholders," and that "[n]one of these funds have been used to benefit private shareholders." Haldeman also endorsed former Treasury Secretary Henry Paulson's sentiment that placing the Companies into conservatorship "wasn't a bailout… [the Companies'] common and preferred shareholders *were being wiped out*." (Emphasis added.)

## G.    The Government Was Not Statutorily Permitted To Impose the Conservatorships

82.    Whatever the validity of the Government's goals from a public policy perspective, they did not constitute a legal basis for imposing conservatorships over the Companies and taking control away from their shareholders, and they had very little, if anything, to do with the Companies' financial health.  As Secretary Paulson told CNBC's Steve Liesman, "We didn't sit there and figure this out with a calculator.  This was about our financial markets; it was about confidence in the financial markets, confidence in our economy, and the validity of the mortgage finance [market]."  As Congressman Barney Frank explained, "[i]t's a case where market psychology became more important than the fundamentals. . . .  There's no immediate crisis.  It's

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

not like [Fannie Mae and Freddie Mac are] going to run out of money tomorrow or Monday.  It's a decision that the market is simply not going to accept the status quo."

83.   The Government's imposition of the Conservatorships over Fannie Mae and Freddie Mac had no legal justification.  HERA, 12 U.S.C. § 4617(a) (3) (A)-(L), which purportedly provided the legal basis to establish the conservatorships, allows the FHFA to place the Companies into receivership or conservatorship *only* if one of the following twelve grounds is present:

> A.   if a Company's assets were insufficient to meet its obligations;
>
> B.   if a Company's assets or earnings were substantially dissipated due to unlawful conduct or unsafe or unsound practices;
>
> C.   if a Company was in an unsafe or unsound condition to transact business;
>
> D.   if a Company willfully violated a cease and desist order;
>
> E.   if a Company concealed books and records from the FHFA Director;
>
> F.   if a Company became unlikely to be able to pay its obligations or meet the demands of its creditors in the normal course of business;
>
> G.   if a Company incurred, or became likely to incur, losses that would deplete substantially all of its capital with no reasonable prospect of becoming adequately capitalized;
>
> H.   if a Company violated the law;
>
> I.   if a Company's board of directors or shareholders passed a resolution consenting to a conservatorship or receivership;
>
> J.   if a Company became undercapitalized or significantly undercapitalized, as defined by the governing statute, and could not or would not take corrective measures;
>
> K.   if a Company became critically undercapitalized, as defined by the governing statute; or
>
> L.   if a Company engaged in money laundering.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

84.     As Director Lockhart later explained to the FCIC, the Government wanted to claim it had the Companies' consent because "they were adequately capitalized" and, absent the so-called "consent," *there was no statutory basis for the conservatorship under any of the other eleven grounds for imposition of a conservatorship noted above*.  Memorandum of Interview With James Lockhart by FCIC (Mar. 19, 2010).  But the imposition of the conservatorships was entirely improper because *the "consent" extracted from the Companies was legally invalid, and none of the other specifically enumerated statutory grounds for establishing the conservatorships was present*.

1.     **Neither of the Companies' Shareholders or Boards of Directors Validly Consented to the Conservatorships**

85.     Title 12 U.S.C. § 4617(a)(3)(I) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity, by resolution of its board of directors or its shareholders or members, consents to the appointment."  As described below, this provision did not provide valid grounds for the imposition of the conservatorships because: (1) neither of the Companies' shareholders consented to the conservatorships; and (2) the purported "consent" obtained from the Companies' boards of directors was only obtained through misrepresentation and/or under duress and was therefore legally invalid.

a.     **Neither of the Companies' Shareholders Consented to the Conservatorships**

86.     The shareholders of Fannie Mae did not consent, by resolution or other means, to the appointment of a conservator.  Likewise, the shareholders of Freddie Mac did not consent, by resolution or other means, to the appointment of a conservator.

- 34 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

**b.    Neither of the Companies' Boards of Directors Validly Consented to the Conservatorships**

87.    Even if the consent of the boards of directors of the Companies was sufficient, this "consent" was legally invalid because it was obtained through misrepresentation and duress.

88.    The coercive nature of the Government's strategy to obtain board consent is clearly evident



UST00530714.

89.    The extortionate nature of this "script" is breathtaking.

- 35 -



On the other hand, the Government had already cleared the decks with respect to any concerns the directors might have regarding a potential breach of their fiduciary duties by consenting when there was an insufficient basis to do so.  The Government artfully avoided this potential issue when it included the highly unusual provision in HERA that immunized the Companies' directors against liability for consenting to the appointment of the FHFA as conservator.  *See* 12 U.S.C. § 4617(a)(6).

90.

the September 4, 2008 Letter to Fannie Mae also identified purported "failures by the board and senior management" of the Company.  FCIC Report 318-319; Sept. 4, 2008 letter to Mudd.  The September 4, 2008 Letter to Freddie Mac was even more severe in its criticism of its management and board of directors, disclosing that FHFA had purportedly "lost confidence in the Board of Directors and the executive management team," holding them accountable for

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

purported losses stemming from "a series of ill-advised and poorly executed decisions and other serious misjudgments."  FCIC Report 318-319; Sept. 4, 2008 Letter to Syron.  These allegations followed the Government's "script" by ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ As Former Freddie Mac CEO Syron later told the FCIC, "there was a very clear message that the [September 4] letter was there as a mechanism to bring about a result."  Former Fannie Mae CEO Mudd agreed that "the purpose of the letter was really to force conservatorship."  FCIC Report, p. 320.

91.    Despite admitting to having "analyzed in great detail the current financial condition of the GSEs" for a four-week period prior to the imposition of the conservatorships, the Government kept this plan secret until the last possible minute.  By September 4, 2008, Government officials had decided to immediately impose the conservatorships, whatever the consequence, and they realized that the lack of an adequate basis to do so on financial grounds, under HERA, made it essential for the Government to extract consent for the conservatorships from the Companies' boards of directors—whether or not the boards actually believed such action to be in the best interests of the Companies.

92.    To implement the Government's plan to force Freddie Mac and Fannie Mae into conservatorship, Treasury decided to hold meetings with the Companies' directors on September 5, 2008, in order to force them into consenting to the imposition of the conservatorships.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

UST00496472 (emphasis added).

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

93.    At these September 5, 2008 meetings, Director Lockhart and Secretary Paulson told Fannie Mae's and Freddie Mac's executives and directors, in no uncertain terms, that the Companies *would* be placed in conservatorship, whether or not they consented.  Secretary Paulson and Director Lockhart emphasized that the Companies had no other option, and that they expected the Companies' boards of directors to comply.  Paulson falsely told them:  "We have the grounds to do this on an involuntary basis, and we will go that course if needed."  Likewise, ████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

94.    In addition to the Government's false assertions regarding the purported inevitability of the conservatorships being imposed on the Companies, the Companies' board members were told by Secretary Paulson, Director Lockhart, and Chairman Bernanke that the decision was not just about the Companies' needs, but rather they said it "goes beyond their individual situations" because "this is about our capital markets, this is about the economy."  *See* Sept. 8, 2008 Tr. of interview with Henry Paulson, https://www.cnbc.com/id/26606180.

95.    To consider the drastic step of appointment of a conservator, in light of the complex financial "facts" developed by the Government and Morgan Stanley, in light of the national economic catastrophe urged by Paulson, Lockhart and Bernanke if the directors did not consent, and the massive personal liability and professional consequences that the directors would suffer if consent was not forthcoming, as described by former Fannie Mae CEO Daniel Mudd in a 2009 speech, the boards only "were given 24 hours to accede to a government takeover – or else the government would effectively go to war against the company."

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

96.     This *de minimis* period afforded to the Companies' board members to consider the drastic step of the appointment of the FHFA as conservator was severely inadequate for meaningful deliberation, thereby rendering any purported consent given by any of the Companies' board members unsubstantiated and invalid.

97.     Faced with substantial threats of potential personal liability and drastic professional consequences, and relying upon false information disseminated by Government officials regarding: (i) the financial "facts" justifying the imposition of the conservatorships; (ii) the view that the U.S. economy would collapse if the Companies were not placed in conservatorship; and (iii) that the conservatorship was inevitable—regardless of how the directors voted—it is hardly surprising that the boards of both Companies exited quietly and allowed the Government to impose its will.

98.     The FCIC Report concluded that "[e]ssentially the GSEs faced a Hobson's choice: take the horse offered or none at all." FCIC Report at 320.

99.     As Secretary Paulson later explained to the FCIC, "I believed the very best way to get them to agree on a friendly basis was to say 'there's a hard way and an easy way, and we hope and expect them to take [the] easy way.  Which they did. []"  In short, the Government—through threats, misrepresentations, and undue pressure and, importantly, without a legal basis—coerced the Companies' directors to breach their fiduciary duties to their shareholders so that the Government could take control of the Companies and further its public policy goals.  Any purported consent given by any of the Companies' directors to the imposition of the conservatorships was thus improperly given and legally invalid.  Accordingly, U.S.C. § 4617(a)(3)(I) cannot provide a legally valid ground for appointing the FHFA as conservator of the Companies.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

100. 

101.

### 2. None of the Other Potential Grounds to Justify Imposition of the Conservatorships Was Present

102. As described above, consent of the Companies' boards of directors was not validly obtained, and cannot provide the requisite grounds for implementing the conservatorships. In addition, none of the other eleven specifically enumerated circumstances that could justify the imposition of a conservatorship were present, as described below.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

a.   **The Companies' assets were significantly greater than their liabilities at the time the conservatorships were established**

103.   Grounds to appoint FHFA as conservator exist pursuant to 12 U.S.C. 4617(a)(3)(A) when "[t]he assets of the regulated entity are less than the obligations of the regulated entity to its creditors and others."   Neither Fannie Mae nor Freddie Mac fell within the purview of this subsection at the time they were placed in conservatorship.

104.   Prior to the imposition of the conservatorship, *Fannie Mae's assets had exceeded its liabilities by more than $40 billion* at the end of each of the three previous calendar years and as of June 30, 2008 (the date of the most recently reported financial results immediately preceding Fannie Mae's conservatorship), *Fannie Mae's assets exceeded its liabilities by more than $39 billion* (dollars in millions):

|  | June 30, 2008 | December 31, 2007 | December 31, 2006 | December 31, 2005 |
|---|---|---|---|---|
| Assets | $885,918 | $879,389 | $843,936 | $834,168 |
| Liabilities | 844,528 | 835,271 | 802,294 | 794,745 |
| Difference | $ 41,390 | $ 44,118 | $ 41,642 | $ 39,423 |

105.   Similarly, Freddie Mac's assets had exceeded its liabilities by more than $26 billion for each of the past three calendar years, and by more than $13.0 billion as of June 30, 2008 (the date of the most recently reported financial results immediately preceding Fannie Mae's conservatorship) (dollars in millions):

|  | June 30, 2008 | December 31, 2007 | December 31, 2006 | December 31, 2005 |
|---|---|---|---|---|
| Assets | $879,043 | $794,368 | $804,910 | $798,609 |
| Liabilities | 865,964 | 767,468 | 777,996 | 772,918 |
| Difference | $ 13,079 | $ 26,724 | $ 26,914 | $ 25,691 |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

106.     Because *each of the Companies' assets exceeded their obligations by many billions of dollars*, the statutory ground for appointing a conservator set forth in section 4617(a)(3)(A) was not satisfied.

        **b.     The Companies had not suffered a substantial dissipation of assets or earnings due to a violation of law or unsafe and unsound practices**

107.     Grounds to appoint FHFA as conservator exist pursuant to 12 U.S.C. § 4617(a)(3)(B) when the entity experiences a "[s]ubstantial dissipation of assets or earnings due to: (i) any violation of any provision of Federal or State law; or (ii) any unsafe or unsound practice." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

108.     From December 31, 2005, to June 30, 2008, Fannie Mae's assets grew from $834.1 billion to $896.6 billion.  Thus, the Company's assets were increasing.  Nor was there a substantial dissipation of Fannie Mae's earnings.  Although Fannie Mae's earnings decreased from 2005 to 2007, they increased in the first half of 2008 over earnings in the second half of 2007. Similarly, from December 31, 2005, to June 30, 2008, although Freddie Mac's earnings declined, its assets grew from $798.6 billion to $879.0 billion.  Thus, Freddie Mac's assets were increasing, not dissipating.

109.     Regardless, any declines in assets or earnings were *not* attributable to either a violation of law or to any unsafe and unsound practice, but to: (i) the narrowing of the interest spread resulting from higher borrowing costs during a period of turmoil in the financial markets; (ii) a non-cash expense to increase loss reserves to offset expected future credit losses stemming from the general decline in the housing market; and (iii) discrete one-time losses on derivatives contracts with corresponding offsetting gains that were not simultaneously recognized.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

110.   *None of these circumstances reflected either a violation of law or an unsafe and unsound practice*, as confirmed by FHFA's September 7, 2008 statement announcing the conservatorships, in which Director Lockhart strongly emphasized that the management and directors of the Companies had done nothing wrong, and noted that any difficulties they were facing were the result of extenuating circumstances.  FHFA, *Statement of FHFA Director James B. Lockhart* (Sept. 7, 2008).  Likewise, in his September 7, 2008 public statement, Secretary Paulson confirmed the conservatorships did not result from any violation of law or any unsafe and unsound practice, stating that "I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, and to the ongoing housing correction.  [Fannie Mae's and Freddie Mac's] management and their boards are responsible for neither."

111.   Because neither Fannie Mae nor Freddie Mac had experienced a substantial dissipation of assets and earnings that was caused by either a violation of law or an unsafe and unsound practice, the potential ground for appointing a conservator set forth in 12 U.S.C. § 4617(a)(3)(B) was not present.

### c.      Neither Company was in an unsafe or unsound condition

112.   Pursuant to 12 U.S.C. § 4617(a)(3)(C), grounds to appoint the FHFA as conservator of Fannie Mae or Freddie Mac are present when the entity is operating in "[a]n unsafe or unsound condition to transact business."

113.   Neither Fannie Mae nor Freddie Mac was operating in an unsafe or unsound condition, as is confirmed by the Companies' compliance with capital requirements.  One of the applicable capital requirements was that the Companies have "total capital" in excess of their "statutory risk-based capital level."  "Total capital" is defined in a published regulation, as is "statutory risk-based capital level"; the latter is specifically crafted to ensure that the Companies

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

remain in a safe and sound condition.  Indeed, the 1992 Act imposing the risk-based capital level required OFHEO to identify a level of total capital by developing an extreme "stress test."  This stress test, often referred to as the "100-year storm" test, required that the Companies' total capital was sufficient to withstand a 10-year period of extreme economic instability and adverse market conditions.  Indeed, HERA specifically contemplates that the risk-based capital requirement shall "ensure that the enterprises operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in the operations and management of [each] enterprise."

114.    As of June 30, 2008, Fannie Mae's core capital exceeded both the FHFA-directed and statutory minimum capital requirement and its total capital exceeded its required risk-based capital.  As of June 30, 2008, Fannie Mae's core capital exceeded its statutory minimum capital requirement by $14.3 billion, or 43.9%, and its total capital exceeded its statutory risk-based capital requirement by $19.3 billion, or 53.1%.  Likewise, Freddie Mac's total capital substantially exceeded the extreme stress test imposed by the statutory risk-based capital requirement of $41.5 billion by $5.1 billion (12.3%) as of June 30, 2008.  Accordingly, each of the Companies was in full compliance with all capital requirements established by OFHEO.  FHFA00098482.  Although HERA required FHFA to devise new risk-based capital requirements, it had not yet done so when the conservatorships were imposed on the Companies.

115.    Because neither of the Companies was operating in an unsafe or unsound condition, the statutory ground for appointing a conservator set forth in 12 U.S.C. § 4617(a)(3)(C) was not present.

### d.    Neither Company was in violation of any cease and desist order

116.    Pursuant to 12 U.S.C. § 4617(a)(3)(D), grounds to appoint the FHFA as conservator are present when there is "[a]ny willful violation of a cease and desist order [by a GSE] that has become final."  At the time of the imposition of the conservatorships, neither Fannie Mae nor

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Freddie Mac were subject to any other cease and desist orders.[2]   Therefore, grounds to appoint FHFA as conservator pursuant to 12 U.S.C. § 4617(a)(3)(D) were not present.

### e.      Neither Company concealed or refused to submit any books or records

117.   Pursuant to 12 U.S.C. § 4617(a)(3)(E), grounds to appoint the FHFA as conservator of Fannie Mae or Freddie Mac are present when there is "[a]ny concealment of the books, papers, records, or assets of the regulated entity, or any refusal to submit the books, papers, records, or affairs of the regulated entity, for the inspection to any examiner or to any lawful agent of the Director."

118.   Because neither Fannie Mae nor Freddie Mac at any time concealed their books and records or refused to make their books and records available for inspection, grounds for appointing the FHFA as conservator set forth in 12 U.S.C. § 4617(a)(3)(E) were not present.

### f.      The Companies were able to pay their obligations and meet the demands of their creditors

119.   Pursuant to 12 U.S.C. § 4617(a)(3)(F), the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is likely to be unable to pay its obligations or meet the demands of its creditors in the normal course of business."

120.   A company's ability to pay its obligations and meet the demands of its creditors can be conclusively demonstrated by significant cash balances.

121.   As of June 30, 2008, Fannie Mae had $344.8 billion of short-term assets, comprised chiefly of cash, cash equivalents, and investments in publicly traded securities.  This far exceeded

---

[2] Although a Consent Order was issued against Fannie Mae by OFHEO on May 23, 2006, Fannie Mae fully complied, and the Consent Order was lifted on May 6, 2008.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

the Company's $247.0 billion in short-term liabilities.  Indeed, Fannie Mae reported "cash and cash equivalents" (the most liquid of assets) of $13.5 billion as of June 30, 2008.

122.   Likewise, as of June 30, 2008, Freddie Mac had $745.4 billion of short-term assets, which greatly exceeded its $356.4 billion in short-term debt.  Indeed, Freddie Mac reported "cash and cash equivalents" (the most liquid of assets) of $43.5 billion as of June 30, 2008.

123.   At the time of the imposition of the conservatorships, both Fannie Mae and Freddie Mac both had sufficient assets to meet their obligations and any demands of their creditors in the normal course of business.  Thus, the ground for appointing the FHFA as conservator set forth in 12 U.S.C. § 4617(a)(3)(F) was not present.

g.   Neither Company incurred or was likely to incur losses that would deplete all or substantially all of its capital

124.   Grounds to appoint FHFA as conservator exist under 12 U.S.C. § 4617(a)(3)(G) when "[t]he regulated entity has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the regulated entity to become adequately capitalized."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

125.   During the period leading up to the imposition of the conservatorships, neither Fannie Mae nor Freddie Mac incurred losses that substantially depleted their capital, let alone all of their capital.

126.   From December 31, 2007, to June 30, 2008, Fannie Mae's total capital *increased* from $48.7 billion to $55.6 billion, and its core capital increased from $45.4 billion to $47.0 billion.  Thus, Fannie Mae's capital had not been depleted.

127.   Likewise, Freddie Mac's capital had not been depleted.  From June 30, 2007, to June 30, 2008, Freddie Mac's core capital decreased only slightly from $37.9 billion to $37.1

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

billion.  Further, the BlackRock ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

128.    Because neither Company had incurred or was likely to incur the depletion of all or

substantially all of its capital, the grounds for appointing the FHFA as conservator pursuant to 12

U.S.C. § 4617(a)(3)(G) were not present.

> **h.     Neither Company violated any law or regulation, or engaged in any unsafe or unsound practice or condition that would likely cause insolvency, a substantial dissipation of assets or earnings, or a weakening of its condition**

129.    Pursuant to 12 U.S.C. § 4617(a)(3)(H), the FHFA may be appointed conservator of

Fannie Mae or Freddie Mac when "[a]ny violation of any law or regulation, or any unsafe or

unsound practice or condition [] is likely to: (i) cause insolvency or substantial dissipation of assets

or earnings; or (ii) weaken the condition of the regulated entity."

130.    Neither Fannie Mae nor Freddie Mac violated any law or regulation; nor did they

engage in any unsafe or unsound practice or condition.  When the conservatorships were imposed,

neither Company was in any danger of becoming insolvent or incurring a substantial dissipation

of assets or earnings, or falling into a weakened condition as the result of any violation of law or

regulation or unsafe or unsound practice or condition.

131.    Because neither of the Companies fell within the purview of 12 U.S.C. §

4617(a)(3)(H), it cannot provide the grounds to support the imposition of the conservatorships.

> **i.     Neither Company was undercapitalized**

132.    Title 12, Section 4617(a)(3)(J) provides that the FHFA may be appointed

conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is undercapitalized or

- 47 -

significantly undercapitalized, and: (i) has no reasonable prospect of becoming adequately capitalized; (ii) fails to become adequately capitalized, as required by:  (I) section 4615(a)(1) of this title with respect to a regulated entity; or (II) section 4616(a)(1) of this title with respect to a significantly undercapitalized entity; (iii) fails to submit a capital restoration plan acceptable to the Agency within the time prescribed under Section 4622 of this title; or (iv) materially fails to implement a capital restoration plan submitted and accepted under Section 4622 of this title." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

133.   At all relevant times prior to and including the time the FHFA was appointed as conservator, the Companies were "adequately capitalized."   To qualify as "adequately capitalized," a company is required to have:

    a.    "Total Capital" (as defined at 12 C.F.R. § 1750.11(n)) equal to or in excess of its "Risk-Based Capital" (as defined at 12 U.S.C. § 4611(a)(1)); and

    b.    "Core Capital" (as defined at 12 C.F.R. § 1750.2) equal to or in excess of its "Minimum Capital" (as defined at 12 C.F.R. § 1750.4).

134.   At the time the conservatorships were imposed over them, not only were the Companies adequately capitalized, as they met both of these requirements, but each Company's capital was substantially *in excess* of its capital requirements.  Moreover, each Company's ability to raise capital from the public equity and private capital markets was more than sufficient to allow it to absorb any potential future losses, particularly if the Companies had been allowed to offer terms to potential investors as favorable as those demanded by the Government in exchange for the extremely costly capital it provided upon taking control of the Companies.   And, the Companies always had more than sufficient assets and capital to satisfy all obligations to their creditors.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

**Fannie Mae and Freddie Mac Core Capital and Total Capital**
**2001 Through June 2008**
**(in millions of dollars)**

| | June 30 | As of Year End | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 |
| **Fannie Mae:** | | | | | | | | |
| Core Capital | 46,964 | 45,373 | 41,950 | 39,433 | 35,514 | 26,953 | 20,431 | 18,234 |
| Total Capital | 55,568 | 48,658 | 42,703 | 40,091 | 35,196 | 27,487 | 20,831 | 18,500 |
| | | | | | | | | |
| **Freddie Mac:** | | | | | | | | |
| Core Capital | 37,128 | 37,867 | 35,365 | 35,964 | 35,009 | 32,985 | 28,990 | 20,181 |
| Total Capital | n/a | 40,929 | 36,742 | 36,781 | 34,691 | 33,436 | 24,222 | 20,137 |

135.   On August 25, 2008, less than two weeks before Fannie Mae and Freddie Mac were placed into conservatorship, independent investment firm BlackRock ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████

136.   Indeed, James B. Lockhart, III (former Director of FHFA) testified to the FCIC that Fannie Mae "was adequately capitalized the day we put them into conservatorship."

137.   Because Fannie Mae and Freddie Mac were more than adequately capitalized, as defined under law, they were not undercapitalized or significantly undercapitalized. Therefore, the FHFA Director lacked any justification or legal authority to appoint a conservator for the Companies.

138.   Moreover, even if one of the Companies had been undercapitalized, Director Lockhart would have been required to provide the undercapitalized company an opportunity to submit and comply with a capital restoration plan, and to demonstrate that it could have raised private capital if and as needed.   Specifically, under 12 U.S.C. § 4615(a) (entitled "Mandatory actions"), as amended by HERA, "[t]he Director [of the FHFA] shall" impose on an

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

undercapitalized regulated entity a capital restoration plan.  Had such a plan been required of either company, both Fannie Mae and Freddie Mac would have been capable of meeting such a requirement and, further, would have been able to raise additional capital from the private markets if and as needed.

139.   Accordingly, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(J) was not satisfied.

### j.      Neither Company was critically undercapitalized

140.   Title 12, section 4617(a)(3)(K) provides that the FHFA should be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is critically undercapitalized."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

141.   As alleged above, at all relevant times, both Fannie Mae and Freddie Mac had total capital and core capital in excess of all applicable regulatory requirements.  Therefore, at all relevant times, neither Fannie Mae nor Freddie Mac was critically undercapitalized.

142.   As such, the ground for appointing the FHFA as conservator set forth in Section 4617(a)(3)(K) was not satisfied with respect to the Companies.

### k.      Neither Company was found guilty of money laundering

143.   Pursuant to 12 U.S.C. § 4617(a)(3)(L), the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he Attorney General notifies the Director in writing that the regulated entity has been found guilty of a criminal offense under section 1965 or 1957 of Title 18 or Section 5322 or 5324 of Title 31."  Because the Attorney General had not made such a notification with respect to either of the Companies, the statutory ground for appointing a conservator set forth in section 4617(a)(3)(L) was not present.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

**H.    The Government Concealed Its Lack of Authority To Impose the Conservatorships By Having FHFA Adopt Unjustified Accounting Policies To Make it Appear that the Companies Were Not and Had Not Been Adequately Capitalized**

144.   Both Freddie Mac and Fannie Mae were required to maintain their reported financial results in compliance with Generally Accepted Accounting Principles ("GAAP"). GAAP is the set of conventions, rules and procedures which constitute the professional standards of the accounting profession.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

145.   Immediately following the imposition of the conservatorships, under the direction of the FHFA, the Companies began to make wildly pessimistic and unrealistic assumptions regarding their assets and future prospects of profitability, triggering write-downs of significant deferred tax assets and the establishment of unjustifiably large loss reserves and causing the Companies to report large non-cash expenses and resulting "paper" losses.  Even though the resulting losses had nothing to do with actual cash flow of the Companies, and were entirely "paper" losses resulting from accounting gimmickry, the resulting (essentially fictitious) losses constituted the fabricated basis that forced the Companies to draw the vast majority of more than $187 billion from Treasury (and begin incurring a permanent annual payment of $18.7 billion, based upon a continuing 10% interest obligation on the unnecessary funding).

146.   In order to support the false narrative put forth by the Government that the conservatorships were necessary to "rescue" Fannie Mae and Freddie Mac from financial distress, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This created the illusion that the Companies needed to accept a massive

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

capital infusion from the Treasury, when in fact they never needed to do so.  Simply put, it was all smoke and mirrors.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

147.    None of these accounting changes were required by, or even appropriate under GAAP, but they forced the Companies to recognize large non-cash losses on their books.  The Government wrongfully used these accounting manipulations to create the false appearance that the Companies lacked liquidity in an effort to justify the conservatorships and necessitate draws from the Treasury that otherwise would not have been needed.

## 1.    Improper Write-Down of Deferred Tax Assets

148.    The relevant provisions of GAAP concerning deferred tax assets are ASC 740 (for financial statements issued for periods ending after September 15, 2009)[3] and FAS 109 (for financial statements issued for periods ending prior to or on September 15, 2009).[4]   The codification of GAAP resulting in ASC 740 did not change the existing requirements under FAS 109, but merely codified the existing GAAP requirements into a single, organized source.

149.    A deferred tax asset results from timing differences between income taxes payable for financial accounting purposes and taxes actually paid to the relevant taxing authorities in which a business has overpaid taxes, or has taxes paid in advance on its balance sheet.  A company's tax

---

[3] *Income Taxes*, Accounting Standards Codification Topic 740, Financial Accounting Standards Board (2009) ("ASC 740").

[4] *Accounting for Income Taxes*, Statement of Financial Accounting Standards No. 109, Financial Accounting Standards Board (1992) ("FAS 109").

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

liability for financial accounting purposes is determined by multiplying its "net income" determined pursuant to GAAP times its effective tax rate.  However, "net income" for tax purposes is determined through the application of the rules and regulations contained in the Internal Revenue Code, and the rules and regulations specified by other applicable taxing authorities.  These differences often relate to the *timing* of when the taxes must be paid rather than the total aggregate amount that will ultimately be paid.

150.   The Companies had large amounts of deferred tax assets related to unrealized losses in their "available-for-sale" securities holdings.  These unrealized losses could be applied to shield the Companies from taxes in future periods, and are thus an identifiable and quantifiable asset of the Companies.

151.   Fannie Mae reported deferred tax assets of $20.6 billion in its financial statements dated June 30, 2008.[5] Fannie Mae explained how realization of the benefits of these assets was more likely than not based upon the Company's current financial condition:

> **Deferred Tax Assets**
>
> We recognize deferred tax assets and liabilities for the future tax consequences related to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and for tax credits. Our net deferred tax assets totaled $20.6 billion and $13.0 billion as of June 30, 2008 and December 31, 2007, respectively. We evaluate our deferred tax assets for recoverability based on available evidence, including assumptions about future profitability. We are required to establish a valuation allowance for deferred tax assets and record a charge to income if we determine, based on available evidence at the time the determination is made, that it is more likely than not that some portion or all of the deferred tax assets will not be realized. Such a charge likely would have a material adverse effect on our results of operations, financial condition and capital position. In evaluating the need for a valuation allowance, we estimate future taxable income

---

[5] Federal National Mortgage Association, Quarterly Report (Form 10-Q), at pp. 5, 15-16, 91 (Aug. 8, 2008).

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

based on management approved business plans and ongoing tax planning strategies. This process involves significant management judgment about assumptions that are subject to change from period to period based on changes in tax laws or variances between our future projected operating performance and our actual results. Accordingly, we have included the assessment of a deferred tax asset valuation allowance as a critical accounting policy.

\*   \*   \*

Although current market conditions have created significant volatility in our pre-tax book income, **our current forecasts of future taxable income reflect sufficient taxable income in future periods to realize our deferred tax assets based on the nature of our book-to-tax differences and the stability of our core business model**.[6]

152.   Likewise, Freddie Mac reported deferred tax assets of $18.4 billion as of June 30, 2008.[7] Freddie Mac disclosed that its analysis led to the determination that the ultimate realization of this deferred tax asset was "more likely than not" based on various factors:

At June 30, 2008, we had a net deferred tax asset of $18 billion of which $11 billion related to the tax effect of losses in our available-for-sale securities portfolio. We believe that the realization of our net deferred tax asset is more likely than not. In making this determination, we considered all available evidence, both positive and negative. The positive evidence we considered primarily included our intent and ability to hold the available-for-sale securities until losses can be recovered, our history of taxable income, capital adequacy and the duration of statutory carryback and carryforward periods and forecasts of future profitability. The negative evidence we considered was the three-year cumulative book loss, including losses in AOCI and the difficulty in predicting potential unsettled circumstances. If future events significantly differ from our current forecasts, a valuation allowance may need to be established.

Prevailing market trends and conditions in the U.S. housing market have created difficulties for mortgage lending institutions and contributed to our experiencing cumulative pre-tax book losses over

---

[6] *Id*. at 15-16 (emphasis added).

[7] Federal Home Loan Mortgage Corp, Quarterly Report (Form 10-Q), at pp.88, 112 (Aug. 6, 2008).

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

the most recent three-year period. Such cumulative losses generally make it difficult to conclude under FAS 109 that a valuation allowance is not needed. **However, our strong earnings history and our assessment that the prevailing market trends and conditions in the U.S. housing market are not a continuing condition support the conclusion that a valuation allowance is not needed**.[8]

153.    Pursuant to GAAP, deferred tax assets should be written down *only* when it is *more likely than not* that the deferred tax asset will not be able to be realized by the company.  FAS 109, ¶¶ 96-98; ASC 740.10.25.   Accordingly, for the Companies to be permitted to write-down the value of their deferred tax assets, it would have to be more probable than not (*i.e.* more than a 50% chance) that the Company would *never* return to profitability and thus never be able to realize the future tax benefits.   The June 30, 2008 financial statements set forth above describe the analysis leading to the conclusion that writing-down the deferred tax assets was not merited pursuant to FAS 109 because of Fannie Mae's "current forecasts of future taxable income" and "the stability of [its] core business model" and because of Freddie Mac's "strong earnings history" and its assessment that the unfavorable trends in the mortgage market were "not a continuing condition." These analyses were eminently reasonable.   Because a deferred tax asset has value when a company has positive income, the most important evidence regarding the likelihood of future profitability is the Companies' long history of profitability.   The Companies had a long history of consistent profitability that far exceeded the three-year history of positive earnings that ordinarily demonstrates that writing-down a deferred tax asset is not merited.[9]

---

[8] *Id.* at 112 (emphasis added).

[9] Before the mortgage-crisis losses of 2007, Fannie Mae had not reported a full-year loss since 1985 and Freddie Mac had never reported a full year loss since being owned by private shareholders in 1989.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

154.   In its September 30, 2008 financial statements, FHFA caused Fannie Mae to write-off $21.4 billion of deferred tax assets and Freddie Mac to write-off $14.3 billion in deferred tax assets, which would require adoption of the implausible assumption that neither Fannie Mae nor Freddie Mac would *ever* return to profitability and generate sufficient taxable income to take advantage of these significant deferred tax assets.  Ignoring Fannie Mae's more than 20-year record of consistent profitability, FHFA concocted its own cherry-picked test regarding the likelihood of Fannie Mae's future profitability that had no established basis under GAAP:

> As of September 30, 2008, we were in a cumulative book taxable loss position for more than a twelve-quarter period. For purposes of establishing a deferred tax valuation allowance, **this cumulative book taxable loss position is considered significant, objective evidence that we may not be able to realize some portion of our deferred tax assets in the future**. Our cumulative book taxable loss position was caused by the negative impact on our results from the weak housing and credit market conditions over the past year. These conditions deteriorated dramatically during the third quarter of 2008, causing a significant increase in our pre-tax loss for the third quarter of 2008, due in part to much higher credit losses, and downward revisions to our projections of future results. As a result of the current housing and financial market crisis, our projections of future credit losses have become more uncertain.

> As of September 30, 2008, we concluded that it was more likely than not that we would not generate sufficient taxable income in the foreseeable future to realize all of our deferred tax assets. **Our conclusion was based on our consideration of the relative weight of the available evidence, including the rapid deterioration of market conditions discussed above, the uncertainty of future market conditions on our results of operations and significant uncertainty surrounding our future business model as a result of the placement of the company into conservatorship by FHFA on September 6, 2008. This negative evidence was the basis for the establishment of the partial deferred tax valuation allowance during 2008.**[10]

---

[10] Federal National Mortgage Association, 2008 Annual Report (Form 10-K), filed Feb. 26, 2009, p. 95 (emphasis added).

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

155.    This arbitrary and unjustifiable assumption cannot reasonably override a demonstrated 20 year record of profitability, and is nothing more than a pretext to justify its unsupportable contention that it was "more probable than not" that the deferred tax assets would never be used by the Company.[11]

156.    Further, the contemporaneous analysis of Freddie Mac's future financial condition by BlackRock █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

157.    The misguided assumptions supporting FHFA's decision to write-down the Companies' deferred tax assets therefore violated GAAP (as described above) and served to dramatically and falsely reduce the Companies' reported net worth and capital. This accounting sleight-of-hand orchestrated by the Government was a primary basis for the purported financial distress of the Companies, necessitating capital draws from Treasury.  Tellingly, these write-downs were later reversed under direction from the Government after it changed the terms of the Preferred Stock Purchase Agreements and executed the Third Amendment thereto (also referred to as the Net Worth Sweep) such that reinstituting the value of these deferred tax assets resulted in a massive windfall for the Treasury.  In other words, the Government arbitrarily and capriciously used this accounting mechanism to suit its needs, not those of the Companies.

---

[11] Freddie Mac did not even provide this type of flimsy "evidence," instead merely conclusory stating that it made its determination "after a thorough evaluation of available evidence."  *See* Federal Home Loan Mortgage Corporation, 2008 Annual Report (Form 10-K), filed March 11, 2009, p. 243.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

## 2. Improper Increases to the Level of Loan Loss Reserves

158.   The relevant provisions of GAAP related to loan loss reserves are ASC 450 and (for financial statements issued for periods ending after September 15, 2009)[12] and FAS 5 (for financial statements issued for periods ending prior to or on September 15, 2009).[13]

159.   Both ASC 450 and FAS 5 require that the Companies evaluate pools of loans in order to recognize an allowance when it is "probable" that the Company will be unable to collect all amounts due, including both the contractual interest and principal payments under the loan agreement.  Based on current information and events, if it is *probable* that a loan loss has been or will be incurred and the amount of the loss can be *reasonably estimated*, a loan loss should be recorded.  ASC 450-20.  This approach is typically quantitatively assessed based on historic net loss experience.

160.   Prior to the mortgage crisis, Freddie Mac suffered a serious delinquency rate of 0.42% on single-family home mortgages as of December 31, 2006.  This figure climbed to 0.65% as of December 31, 2007, to 1.72% as of December 31, 2008 and to 3.87% as of December 31, 2009.  Similarly, Fannie Mae suffered a serious delinquency rate of 0.65% as of December 31, 2006.  This figure climbed to 0.98% as of December 31, 2007, to 2.42% as of December 31, 2008 and to 5.38% as of December 31, 2009.  These rates compare quite favorably to the national averages for serious delinquencies of prime loans reported by the National Delinquency Survey from the Mortgage Bankers Association:  2.21% as of December 31, 2006, 3.62% as of December

---

[12] *Contingencies*, Accounting Standards Codification Topic 450, Financial Accounting Standards Board (2009) ("ASC 450").

[13] *Accounting for Contingencies*, Statement of Financial Accounting Standards No. 5, Financial Accounting Standards Board (1975) ("FAS 5").

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

31, 2007, 5.17% as of December 31, 2008 and 6.84% as of December 31, 2009.  The default rates of subprime loans were markedly higher still.

161.    In assessing the appropriate amount of loan loss reserves that should be taken, ASC 450-20 and FAS 5 require that the expected loss from a pool of loans be determined by reference to the following formula:   Expected Loss = PD (Probability of Default) x LGD (Loss Given Default) x EAD (Exposure at Default).  In making this calculation, the company should rely on its historical loss experiences, adjusted for current trends and conditions.

162.    Despite the fact that the Companies' mortgage portfolios were far safer than similar portfolios held by large banks involved in the mortgage business (such as J.P. Morgan Chase, Bank of America, Citi and Wells Fargo), these banks were far less aggressive in taking loss allowances that served to diminish their net worth.  These banks employed the same "Expected Loss" formula identified above, but recognized annual loan loss provisions of between 1.0 and 2.0 times their actual credit losses recognized during 2007 through 2009.  By contrast, Fannie Mae and Freddie Mac were forced by FHFA to recognize loan loss provisions of between 4.0 and 5.0 times their actual credit losses recognized from 2007 through 2009 *(or 3 to 4 times higher than banks holding similar, yet riskier loans)*.

163.    The lower levels of loan loss provisions recognized by banks were the industry standard, complied with GAAP and were ultimately proven to be a far more accurate assessment of future liability than were the three to four times higher loan loss provisions resulting from the unreasonable assumptions foisted on Fannie Mae and Freddie Mac by FHFA.  The unreasonable FHFA-mandated assumptions were not consistent with GAAP, and caused the Companies to recognize loan loss reserves far in excess of the amounts that were required under GAAP, or were otherwise reasonable under the circumstances.  Even assuming that the Companies' loan loss

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

reserves were only three times higher than appropriate (the low end of the comparison to the large banks), Fannie Mae's loan loss reserves were overstated by approximately $100 billion, and Freddie Mac's loan loss reserves were overstated by more than $40 billion.

164.    The non-cash "losses" generated by these improper accounting tricks temporarily decreased the Companies' reported net worth by hundreds of billions of dollars.  Although they had no effect on the cash flows generated by the Companies, or on their ability to pay their expenses and debts, these "paper losses" caused by FHFA's mandated accounting manipulations and falsifications caused the Companies' net losses to be overstated by many billions of dollars, forcing them to unnecessarily borrow more than $187 billion pursuant to the terms of the PSPAs—draws that could not be repaid and would require interest payments to the Government of approximately $18.7 billion per year *forever*.

**I.    Post Conservatorship Events: The Government Strengthens Its Grip on the Companies By Creating The Third Amendment to the PSPAs**

165.    Long after imposing the conservatorships, the Government continued its campaign of cutting investors out of their share of the Companies' profits, and furthering its narrative that the Companies required the Government's rescue.

166.    Even saddled with the Government's improper accounting manipulations and extortionate interest charges relating to the forced borrowing of money they did not need, the Companies came roaring back to profitability.  By 2010, the FHFA observed that the Companies' financial results were ███████████████████████████████████████████████

█████████████████████████████

167.    By late 2011, both Treasury and the FHFA ███████████████████████

███████████████████████████████████████████████████████████

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER



168.     By the spring of 2012, both Companies were exceeding the FHFA's most optimistic projections and were generating billions of dollars in net income.  Fannie Mae 2Q 2012 Form 10-Q at 86, Freddie Mac 2Q 2012 Form 10-Q at 106. With these strong profits, even FHFA could no longer justify the write-down of the Companies' deferred tax assets.

169.

170.    Treasury officials

171.    By 2012, the Companies had collectively drawn $187 billion from the Treasury, entitling Treasury to dividends from the Companies of almost $19 billion per year.  At least $161 billion of the amounts drawn related directly to the FHFA's decision to force the Companies to improperly write-down the value of their assets as described in Section V(H), *infra*.

172.    In August 2012, the Government amended the PSPAs for the third time and significantly altered its economic arrangement with the Companies.  Under that amendment (the "Third Amendment"), beginning in January 2013, FHFA agreed with Treasury to replace the existing requirement of quarterly dividend payments by the Companies to Treasury with a quarterly "sweep" of each Company's entire net worth to Treasury, regardless of the amounts

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

actually owed by the Companies (the "Net Worth Sweep").  This Government action left no residual value for the Companies' shareholders, despite the fact that the Companies were once again very profitable.

173.    FHFA's agreement to the Net Worth Sweep was far outside of its statutorily limited powers as a "conservator" to *only* "take such action as may be: (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and *preserve and conserve the assets and property* of the regulated entity. 12 U.S.C. § 4617(b)(2)(D) (emphasis added).

174.    ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

175.    A press release issued by Treasury on the date it forced the Companies to enter into the Third Amendment to the PSPAs left no doubt about the Government's plan to liquidate the Companies and seize "every dollar" of their assets:

> **Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac**
>
> 8/17/2012
>
> *Modifications to Preferred Stock Purchase Agreements Will Make Sure That Every Dollar of Earnings Fannie Mae and Freddie Mac Generate Will Benefit Taxpayers*
>
> *Announcement Will Support the Continued Flow of Mortgage Credit during a Responsible Transition to a Reformed Housing Finance Market*
>
> **WASHINGTON** -- The U.S. Department of the Treasury today announced a set of modifications to the Preferred Stock Purchase Agreements (PSPAs) between the Treasury Department and the Federal Housing Finance Agency (FHFA) as conservator of Fannie

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Mae and Freddie Mac (the Government Sponsored Enterprises or GSEs) that will help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market.

"With today's announcement, we are taking the next step toward responsibly winding down Fannie Mae and Freddie Mac, while continuing to support the necessary process of repair and recovery in the housing market," said Michael Stegman, Counselor to the Secretary of the Treasury for Housing Finance Policy. "As we continue to work toward bi-partisan housing finance reform, we are committed to putting in place measures right now that support continued access to mortgage credit for American families, promote a responsible transition, and protect taxpayer interests."

176.    On August 17, 2012, in announcing the execution of the Third Amendment, Acting Director DeMarco acknowledged that the FHFA planned to "gradually contract[] [Fannie Mae and Freddie Mac's] operations." FHFA Statement, *Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17, 2012).

177.    That the Government has received, and continues to receive, a windfall at the expense of Fannie Mae's and Freddie Mac's shareholders could not be clearer.  As reported in an April 10, 2013 *Wall Street Journal* article, the Companies paid the Treasury roughly $55.2 billion in dividends since the Conservatorships were imposed, through 2012.  Moreover, the Treasury has calculated that, between 2013 and 2023, the Companies will collectively pay an additional $183.3 billion in projected dividends.  *The Wall Street Journal* article also noted that the terms of the PSPAs "don't actually provide a mechanism for them to buy back the [senior] preferred shares that the government has taken.  In that sense, Fannie and Freddie are simply making interest payments on a loan that can't ever be paid off."  As such, this usurious "cash cow" arrangement, implemented under the conservatorships, which were based on completely false premises from the outset, and facilitated through the PSPAs and the Third Amendment, has provided the Government

- 63 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

with an extremely generous source of funding by taking all the Companies' earnings, and thereby destroying the economic value of the rights and property interests of the Companies' common and preferred shareholders.

178.   The Companies' continued, strong financial health was beyond question.  Fannie Mae announced earnings of $17.2 billion in 2012, which included earnings of $7.6 billion in 4Q 2012—the Company's "largest annual and quarterly net income in its 75-year history."  Similarly, Freddie Mac announced a record-breaking $11 billion in profits for 2012.  Indeed, in early May 2013, Freddie Mac announced that the first quarter of 2013 was the second best quarter in the Company's history with net income of $4.6 billion for the quarter.  Likewise, Fannie Mae announced that it had earned a record $58.7 billion profit for the first quarter of 2013, including applicable tax credits.

179.   Two primary things contributed to the Companies' renewed profitability.  First, now that the Companies had been permitted to increase their guarantee fees—indeed, they have been required to do so under the Temporary Payroll Tax Cut Continuation Act—they have been able to further increase their revenue.  In evaluating the Companies, analysts have noted that "[t]heir guarantee fee income is . . . at 'unprecedented rates,' and their default rates are at four year lows . . . ." Notably, if the Companies had been allowed to increase their guarantee fees earlier to reflect the increased risk in the market, as they had requested, it would have helped Fannie Mae and Freddie Mac generate higher earnings and improve their balance sheets even sooner.

180.   Second, the Government's subsequently revised treatment of the Companies' deferred tax assets, the very same assets that it previously forced them to write down, also contributed to the Companies' profitability, as well as the Government's ability to substantially reduce the federal deficit.  As explained in an April 8, 2013 *Washington Post* article, the

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Companies had considered reversing close to $90 billion of tax credit write-downs, previously forced upon them by the Government in late 2008 after it took control of the Companies, an amount that now would flow conveniently to Treasury at a time when the Government was struggling to continue operations in the face of a looming debt ceiling.  According to the *Washington Post* article, these write-downs, when combined with the Companies' strong earnings for the first quarter of 2013 would mean that the Companies' "June payments could about equal the $100 billion by which former Treasury secretary Timothy F. Geithner told Congress in December the U.S. debt grows on average each month."  As one analyst commented, "[i]t could mean a pretty big chunk of cash for the Treasury at a time they need it[.]"

181.   Indeed, the fact that the Government was willing to make this change at a time in which it was in desperate need of revenue to meet its budget and debt obligations, but was not willing to do so when it wanted to portray the Companies as being in a state of financial distress, underscores the degree to which any prior appearance of financial infirmity resulted largely, if not entirely, from deceptive accounting manipulations by the Government as a key part of its imposition and implementation of the conservatorships.  As Treasury spokesman Anthony Coley told *The Washington Post*, Fannie Mae's potential large earnings are "an accounting issue between the company, its auditors and its regulator."

182.   In short, for almost a decade now, the Government has been reaping, and appears likely to do so indefinitely, a fortune from its wrongful takeover of Fannie Mae and Freddie Mac. As of the end of 2017, Fannie Mae and Freddie Mac were forced to give over $223 billion in "dividends" to Treasury under the Net Worth Sweep agreement.  That is in addition to the over $55 billion in dividends they were forced to pay Treasury under the prior agreement between 2008 and 2012.  The Government's shrewdly designed scheme to provide the Companies with capital

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

from the Treasury in order to support the Government's public policy objectives in exchange for all their future profits, under the guise of the completely unwarranted conservatorships which gave the Government total control over the Companies and the ability to use them however it saw fit, has taken all the rights and the economic value of their property interests away from the Companies' shareholders who have been left with virtually nothing.

183.   The Third Amendment was merely an altered method of forcing Fannie Mae and Freddie Mac into a perpetual cycle of paying exorbitant dividends on unneeded cash infusions from the Treasury.  This arrangement was created and imposed by the Government to allow it to benefit as much as possible from the usurious scheme it had forced on the Companies, while also achieving its public policy objectives by providing a "backdoor" bailout to other financial institutions and thereby increasing liquidity in the mortgage market.  This entire scheme was effectuated to provide critical support to the nation's economy, a worthwhile objective to be sure, but not one that should be confused with rescuing the Companies, neither of which was in any real need of rescue.  This was down on the backs of the Companies' shareholders, who never received any compensation for the losses they suffered as a result of the Government's actions.

184.   Once it became clear that the Companies were sufficiently profitable to generate earnings even beyond what was owed to the Treasury in dividends under the extremely onerous provisions of the original PSPAs, the Government conveniently amended the terms of the PSPAs to further ensure that all of the Companies' profits would be unquestionably transferred to the Treasury going forward.  By design, the original PSPAs were orchestrated to preclude the Companies' outstanding public shareholders from receiving any value indefinitely, but the Third Amendment has further streamlined and finalized that process, forcing Fannie Mae and Freddie

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Mac to completely and fully transfer any remaining economic value from their shareholders to the Treasury, guaranteeing that the shareholders are left with nothing, and without compensation.

## VI. THE GOVERNMENT'S CONDUCT CONSTITUTED AN ILLEGAL EXACTION AND/OR TAKING WITHOUT JUST COMPENSATION IN VIOLATION OF THE U.S. CONSTITUTION

185.   The following Government actions, made with respect to the Companies, constituted an illegal exaction and/or taking:   (a) imposing the conservatorships upon the Companies, under false pretenses and without a proper statutory basis, causing the value of the Companies' shares to plummet, and destroying all shareholder rights and property interests; (b) imposing the usurious terms of the PSPAs on the Companies and taking warrants for 79.9% of the common stock at a nominal exercise price, thereby further diluting shareholder value and eviscerating the ability of the shareholders to control the Companies they owned; (c) dissipating the assets of the Companies during the conservatorships by forcing them to assume and guarantee large amounts of toxic debt, unnecessarily increase their loan loss reserves, and write-down the value of their deferred tax assets far more than was warranted; and (d) subsequently changing the terms of the PSPAs through the Third Amendment to more fully ensure a "net worth sweep" and further taking any remaining value away from the Companies' shareholders.

## A. The Government Disregarded the Rights and Property Interests of the Companies' Shareholders in Taking Control of the Companies to Achieve Its Public Policy Objectives

186.   In taking control of the Companies away from their shareholders by imposing the conservatorships upon them, under false pretenses and without a statutory basis, forcing the Companies to issue senior preferred stock to the Treasury under the usurious, unilaterally imposed terms of the PSPAs, to further its own public policy objectives, the Government completely disregarded the rights and ownership interests of the Companies' shareholders.  Nor did the Government provide those shareholders with any compensation—much less just compensation—

- 67 -

for the property rights and interests that were taken from them.   Instead, the Government's operation of the conservatorships made it virtually impossible for the Companies to regain their status as private, shareholder-controlled corporations and the shareholders of the Companies were left with nothing indefinitely.

> ### 1. Plaintiffs Had a Property Interest in the Economic Value Associated with Their Shares of Fannie Mae and Freddie Mac Common and Preferred Stock

187.   Fannie Mae had 1,076,207,174 shares of common stock outstanding as of both June 30, 2008, and September 30, 2008, and presumably on the date of the conservatorship.  Fannie Mae common shares traded at over $30 per share during 2008, including closing trading at $7.04 per share on September 5, 2008 (the last trading day prior to the conservatorship).  On September 8, 2008, immediately following the announcement of the conservatorship, Fannie Mae common shares closed trading at just $0.73 per share.  As of May 3, 2013, Fannie Mae shares closed trading at $0.82 per share.

188.   Freddie Mac had 647,015,161 shares of common stock outstanding as of July 28, 2008, and 647,158,633 shares of common stock outstanding as of November 10, 2008.  Freddie Mac shares traded above $25 per share during 2008, and closed trading on September 5, 2008 (the last day of trading prior to the conservatorship) at $5.10 per share.  On September 8, 2008, immediately following the conservatorship, Freddie Mac common shares closed trading at just $0.88 per share.  As of May 3, 2013, Freddie Mac shares closed trading at $0.82 per share.

189.   At the time of the conservatorships, Fannie Mae had roughly $21 billion in total redemption value of preferred shares outstanding, and Freddie Mac had roughly $14 billion in total redemption value of preferred shares outstanding.  The value of each of these shares declined dramatically upon the announcement of the conservatorships and the enactment of the PSPAs on September 7, 2008, as shown in the following charts:

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

## Fannie Mae Changes in Preferred Share Prices

**Share Price**

| Series | CUSIP | 5-Sep-08 | 8-Sep-08 |
|--------|-------|----------|----------|
| D | 313586505 | Not Available | Not Available |
| E | 313586604 | 19.20 | 7.00 |
| F | 313586703 | 11.70 | 3.25 |
| G | 313586802 | 12.57 | 3.05 |
| H | 313586885 | 19.45 | 3.70 |
| I | 313586877 | 18.80 | 3.50 |
| L | 313586844 | 18.63 | 3.40 |
| M | 313586836 | 17.66 | 3.50 |
| N | 313586828 | 19.83 | 3.65 |
| O | 313586794 | 21.50 | 3.57 |
| 2004-1 | 313586810 | 35,000.00 | 7,950.00 |
| P | 313586786 | 8.52 | 2.01 |
| Q | 313586778 | 11.85 | 2.26 |
| R | 313586760 | 13.37 | 2.70 |
| S | 313586752 | 14.00 | 3.42 |
| 2008-1 | 313586745 | 17.56 | 1.45 |
| T | 313586737 | 13.70 | 3.00 |

## Freddie Mac Changes in Preferred Share Prices

**Share Price**

| Series | CUSIP | 5-Sep-08 | 8-Sep-08 |
|--------|-------|----------|----------|
| B | 313400608 | 12.75 | 2.50 |
| Not Listed | 313400889 | 21.375 | 1.00 |
| F | 313400863 | 16.05 | 2.80 |
| G | 313400848 | 12.71 | 2.50 |
| H | 313400855 | 16.85 | 2.55 |
| Not Listed | 313400822 | 14.00 | 2.00 |
| Not Listed | 313400814 | 15.95 | 16.00 |
| K | 313400830 | 19.50 | 2.65 |
| L | 313400798 | 10.80 | 3.50 |
| M | 313400780 | 15.75 | 3.05 |
| N | 313400764 | 14.00 | 4.75 |
| O | 313400772 | 19.05 | 3.09 |
| P | 313400749 | 21.00 | 3.50 |
| Q | 313400756 | 13.80 | 2.50 |
| R | 313400731 | 18.55 | 3.00 |
| Not Listed | 313400723 | Not Available | Not Available |
| S | 313400715 | 14.25 | 3.00 |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| T | 313400699 | 21.05 | 3.02 |
| U | 313400681 | 10.50 | 1.71 |
| V | 313400673 | 9.15 | 1.71 |
| W | 313400665 | 9.29 | 1.83 |
| X | 313400657 | 14.05 | 2.02 |
| Y | 313400640 | 10.90 | 1.90 |
| Z | 313400624 | 13.56 | 2.87 |

**2.      Plaintiffs had a Reasonable Investment-backed Expectation that the Government Would Not Appropriate Shareholder Value and Rights in the Companies**

190.   The Companies' shareholders had a reasonable investment-backed expectation that the Government would not take their private property rights and interests without just compensation.

191.   Since 1968, Fannie Mae had been owned and controlled by private shareholders and publicly traded on the New York Stock Exchange.  Similarly, since 1984, Freddie Mac had been owned and controlled by private shareholders and publicly traded on the New York Stock Exchange.  Although the Companies were charged with a public mission under their charters, they operated successfully for decades, raising capital from investors through the public equity and private capital markets, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.

192.   As with any other publicly traded company, the owners of Fannie Mae and Freddie Mac stock were vested with specific rights attendant to their ownership.  These rights were specifically enumerated in by-laws and the prospectuses and registration statements, and proxies for each of the Companies' common stock and series of preferred stock.  Private investors long considered Fannie Mae and Freddie Mac securities to be popular, sound, conservative investments.  The popularity, transferability and soundness of the Companies' stock, prior to the conservatorships, were clearly evidenced by, among other factors, the extent to which these shares

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

were traded on the open market.  For example, during the three years before Fannie Mae was placed into conservatorship, *i.e.,* from September 5, 2005, through September 5, 2008, Fannie Mae's common stock had an average daily trading volume of more than 13 million shares. Likewise, during that same time-period, Freddie Mac's common stock had an average daily trading volume of more than 12 million shares.

193.   Under the 1992 Act, absent an egregious refusal to accede to OFHEO directives, or the willing consent to a conservatorship by the Companies' boards of directors or their shareholders, the only justification for imposing a conservatorship over the Companies would stem from a condition of financial distress.  This draconian measure had never been used, not even during the financial accounting scandals that plagued the companies in the mid-2000s.  In short, there was no reason to believe that there would ever be a reason to impose a conservatorship over the Companies and, in the unlikely event that one was implemented over either of the Companies, their investors had a reasonable expectation that any such conservatorship would be done for legitimate reasons in accordance with the applicable statutory provisions for doing so, not based on false pretenses created by the Government, and that such conservatorships if truly necessary at some point in time would be used to protect and preserve the Companies' assets, as the statutory provisions were designed to ensure.

194.   After 16 years of having the 1992 Act on the books, the new statute that was passed in July 2008 significantly increased the powers of the Government over the Companies, well beyond the regulatory powers that existed under the prior statute that was in place when the vast majority of the Companies' shareholders purchased their common and preferred stock.  Although members of Congress and other Government officials, upon passage of HERA, strongly indicated that they never anticipated that these new powers, which Treasury Secretary Paulson referred to

- 71 -

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

as a "bazooka," would need to be exercised, the Government invoked this "bazooka" a mere ten weeks after its passage, and it created a false justification for this decision which in reality had nothing to do with the actual provisions of the statute or any valid concern for the financial health of the Companies. The Government then used the conservatorships to terminate the rights of the Companies' shareholders, force the Companies to execute the PSPAs and subsequent amendments, provide large amounts of additional liquidity to the mortgage market using capital provided by the Treasury to the Companies under a predatory lending arrangement, at great detriment to the Companies and their shareholders, and ensure that all the Companies' future profits would be transferred directly to the Government. Plaintiffs and the members of the Classes had no reasonable expectation that the Government would impose these conservatorships in this manner and use them for these purposes, based on purported capitalization concerns that didn't exist, especially when the Government had so often assured the public of the Companies' solvency, even weeks before the imposition of the conservatorships, and especially when it didn't do so following the Companies' 2003-2006 accounting scandals, which resulted in the restatement of billions of dollars in earnings and the payment of hundreds of millions of dollars in penalties.

195.    Plaintiffs and the members of the Classes likewise had no reasonable expectation that the Treasury would abuse its power by forcing the Companies to enter into the PSPAs and amendments thereto. The Treasury did not seek or obtain the Companies' consent to sign those agreements; instead, it gave the Companies the Hobson's choice of either "agreeing" to them voluntarily or having them imposed by force. Moreover, in drafting the terms of the PSPAs, the Treasury failed to take into consideration factors required by the Companies' charters. The Treasury likewise unlawfully extended the duration of the PSPAs years beyond the 2009 limitation required by law. While HERA contemplated a conservatorship designed to return the Companies

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

to financial health, the Government used the conservatorships to support the economy at unprecedented levels by forcing the Companies to assume the liabilities of other institutions and provide increased liquidity to the mortgage market.  Although this action was taken for a laudable public benefit, it required the payment of just compensation to the shareholders of the Companies who suffered the nearly complete destruction of the value of their private property interests.

196.   Moreover, none of the conditions required under HERA for the imposition of a conservatorship existed.  The Companies were adequately capitalized and representatives from the Treasury, the Federal Reserve, Congress, and the FHFA repeatedly represented this fact in the months and weeks leading up to the Government's imposition of the conservatorships.  Based on those representations, Plaintiffs and the members of the Classes were not and could not have been aware that the Government believed the conditions necessary to assert a conservatorship existed. Therefore, they could not have reasonably anticipated that the Government would impose the conservatorships in the first instance.

**B.     The Government's Conduct Constituted a "Taking" Under the Fifth Amendment to the United States Constitution**

197.   As described above, the Government pursued broad public policy goals that caused it to substantially harm the value of the Companies under its control, rather than operating the conservatorships in a manner designed to preserve and protect the value of the Companies as is the intended statutory purpose of the conservator.

198.   Specifically, rather than preserving and protecting the value of the Companies, the Government used them as a vehicle to restore investor confidence in the mortgage market by providing a mechanism for other financial institutions to unload their bad mortgage debts.  That Fannie Mae and Freddie Mac were seized purely to accomplish public policy goals, separate and apart from the financial health of the Companies themselves, could not be clearer.  According to

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

statements in its Annual Reports since the imposition of its conservatorship, Fannie Mae alone "provided approximately $2.3 trillion in liquidity to the mortgage market in 2009 through 2011 through [its] purchases and guarantees of loans, which enabled homeowners to refinance 6.6 million mortgages, 1.9 million households to purchase a home, and financing for over 1.1 million units of multifamily housing."

199.   The purchases of toxic debt by Fannie Mae and Freddie Mac from other troubled financial institutions were financed through the expensive draws from the Treasury as defined in the PSPAs.   Through this strategy, the Government was able to get the toxic debt off the banks' balance sheets (thus supporting the economy by restoring investor confidence in the banks) and provide additional liquidity to the mortgage market at a time when other institutions were fleeing this industry, while forcing the Companies to finance the Government's objectives.   Not surprisingly, the Government-orchestrated acquisition of these toxic mortgages and mortgage-related securities by the Companies, through a usurious financing arrangement it forced upon them, caused a significant loss of economic value to their shareholders.

200.   The damage to Fannie Mae and Freddie Mac and, in turn, to their shareholders' interests was further exacerbated by the otherwise unwarranted accounting changes forced upon the Companies by the Government.   Specifically, by forcing the Companies to dramatically increase their loan loss reserves, in large part to account for the assumption of additional toxic assets instructed by the Government, and unreasonably write down the value of their deferred tax assets, the Government squandered the value of the Companies and, accordingly, the equity interests held by their shareholders, creating the false perception at the time that they were less adequately capitalized than was actually the case and thereby necessitating further draws from the Treasury.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

201.   In short, the Government effectively nationalized the Companies to use them to facilitate its own public policy objectives, which benefited the general public by supporting the economy during a very difficult time, but destroyed shareholder value and the shareholder rights and property interests.   As noted in Fannie Mae's Form 10-K for the year ending December 31, 2011, issued under FHFA control, "[b]ecause we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters.   The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship, and we are no longer managed with a strategy to maximize shareholder returns."   Similarly, Freddie Mac disclosed in its 2011 Form 10-K that "[b]ecause we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns."

### 1.      The Imposition of the Conservatorships Constituted a Taking of Private Property

202.   Under the terms of the conservatorships, the FHFA assumed the powers of the Companies' boards of directors and management, and the Companies' CEOs were dismissed.   It terminated all shareholder meetings and all shareholder voting rights.   These Government actions caused the Companies' preferred and common stock values to plummet.   The common stock of Fannie Mae and Freddie Mac subsequently traded at less than $1.00 per share—down from over $30.00 per share and $25.00 per share, respectively, during 2008.   Preferred shares of each of the Companies subsequently traded at roughly 10-15% of face value.

203.   The placement of the Companies into conservatorship and the subsequent actions taken by the Government erased shareholder value and destroyed the rights and property interests of the Companies' preferred and common shareholders.   While the Government guaranteed payments on the Companies' outstanding debt instruments through financing agreements with the

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Treasury, the Companies were ordered to cease paying dividends on their preferred and common stock. Although this stock would remain outstanding, on June 16, 2010, the FHFA ordered the Companies to delist their common and preferred shares from the New York Stock Exchange. The immense loss of property rights and destruction of value were suffered completely by the Companies' shareholders at the behest of the Government.

**2.      The August 2012 Amendment to the PSPAs Further Guaranteed that the Taking of Private Property Was Permanent**

204.   Pursuant to the August 2012 Third Amendment to the PSPAs, the Government changed the terms of the PSPAs to provide for a "net worth sweep" by creating a dividend obligation that encompasses all of the net worth of the Companies on a quarterly basis as of January 1, 2013. There is a diminishing, modest capital reserve requirement that is backed out of this quarterly dividend obligation from January 1, 2013, through December 31, 2017, and thereafter the capital reserve amount is reduced to zero. This means that 100% of the Companies' profits are now being transferred to the Government on a quarterly basis.

205.   Accordingly, this Government action has further ensured that there can be no distribution to either the preferred or the common shareholders no matter how much net income the Companies earn. As such, the Third Amendment has streamlined the process by which the Government has forced Fannie Mae and Freddie Mac to transfer all their economic value from the Companies' shareholders to the Treasury, further guaranteeing that the shareholders are left with nothing. Thus, the Government's actions have appropriated many billions of dollars' worth of private shareholder property, without providing any compensation for this harm.

**C.      The Companies' Shareholders Have Lost Billions of Dollars as a Result of This Misconduct**

206.   Fannie Mae's preferred shares traded at approximately 3% to 14% of face redemption value on September 8, 2008—the first day of trading after the imposition of the

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

conservatorship, resulting in a loss of approximately $19.1 billion for preferred shareholders. Likewise, Fannie Mae's common shares dropped from $7.04 per share on September 5, 2008, to close at just $0.73 per share on September 8, 2008—a loss of approximately $6.8 billion.  **In total, Fannie Mae preferred and common shareholders lost more than $25.9 billion on the first trading day after the imposition of the conservatorship**.

207.   Freddie Mac's preferred shares traded at approximately 2% to 16% of face redemption value on September 8, 2008—the first day of trading after the imposition of the conservatorship, resulting in a loss of approximately $12.9 billion for preferred shareholders. Likewise, Freddie Mac's common shares dropped from $5.10 per share on September 5, 2008, to close at just $0.88 per share on September 8, 2008—a loss of approximately $2.7 billion on the first day of trading following the imposition of the conservatorship.  **In total, Freddie Mac preferred and common shareholders lost more than $15.6 billion on the first trading day after the imposition of the conservatorship.**

208.   In total, preferred and common shareholders of the two companies suffered a loss in value of more than $41 billion from the day prior to the first trading day immediately following the imposition of the conservatorships.

## VII.   CLASS ALLEGATIONS

209.   Pursuant to Rule 23:  (A) with respect to Fannie Mae (1) Plaintiff City of Austin Police Retirement System brings this action on behalf of all persons or entities who held shares of Fannie Mae common stock on or before September 5, 2008, and (2) Plaintiffs Washington Federal and Michael McCredy Baker bring this action on behalf of all persons or entities who held shares of Fannie Mae preferred stock on or before September 5, 2008; and (B) with respect to Freddie Mac (1) Plaintiff City of Austin Police Retirement System brings this action on behalf of all persons or entities who held shares of Freddie Mac common stock on or before September 5, 2008,

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

and (2) Plaintiffs Washington Federal and Michael McCredy Baker bring this action on behalf of all persons or entities who held shares of Freddie Mac preferred stock on or before September 5, 2008.  Excluded from the Classes are Defendant and any agencies or political appointees thereof.

210.   The requirements of Rule 23(a) are satisfied.

211.   The members of each Class are sufficiently numerous that joinder of all members is impracticable.  As of September 2008, Fannie Mae had outstanding approximately 1 billion shares of common stock and approximately 597 million shares of preferred stock (with a total redemption value of approximately $21 billion) outstanding.  Freddie Mac had approximately 650 million shares of common stock outstanding and approximately 464 million shares of preferred stock (with a total redemption value of approximately $14 billion) outstanding.  Although there likely were thousands of individual shareholders impacted here, the exact number of Class members is unknown by Plaintiffs at this time and can only be ascertained by the books and records of Fannie Mae and Freddie Mac and their transfer agents.

212.   Common questions of law and fact exist as to all Class members.  These questions likewise predominate over individual questions unique to any Class member.  Such common questions include:

(a)   Whether the Government had a legal basis to appropriate Class members' property;

(b)   Whether the Government, in fact, appropriated Class members' property without just compensation in violation of the United States Constitution;

(c)   Whether the Government illegally exacted Class members' property;

(d)   Whether the Government's appropriation and subsequent control of the Companies was exercised in a manner that deprived Class members of Due Process in violation of the United States Constitution; and

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

(e)      Whether Plaintiffs and the Classes are entitled to just compensation for the Government's taking and/or illegal exaction of their property rights, and if so the amount of such compensation.

213.   Plaintiffs' claims are typical of those of other Class members.  The Government's actions have impacted Class members equally because they were directed at all the Companies' common and preferred shareholders as a whole.  Accordingly, Plaintiffs' claims based on the conduct alleged herein are identical to those of other Class members.

214.   Plaintiffs will fairly and adequately represent the interests of Class members.  There are no conflicts between Plaintiffs and the members of the Classes.  Plaintiffs have retained counsel experienced in the prosecution of complex litigation and commercial class actions who have sufficient resources and are ready, willing and able to litigate this action vigorously to its conclusion.

215.   The requirements of Rule 23(b)(3) are also satisfied.

216.   Common questions of law and fact predominate over any questions related to any individual Class member and a class action is a superior vehicle to litigate this action.  No Class members have an interest that would necessitate the prosecution of separate actions; Plaintiffs are not aware of any litigation concerning the matters alleged herein already brought by Class members; and Plaintiffs do not anticipate any difficulties in managing this case as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE
### (ILLEGAL TAKING AND/OR EXACTION
### IN VIOLATION OF THE UNITED STATES CONSTITUTION)

217.   Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

218.    In imposing the unprecedented conservatorships over the Companies and in taking and/or illegally exacting more than 1 billion shares of the common stock and approximately 597 million shares of the preferred stock of Fannie Mae (with a redemption value of approximately $21 billion) and approximately 650 million shares of the common stock and approximately 464.1 million shares of the preferred stock of Freddie Mac (with a redemption value of approximately $14 billion) without just compensation, the Government destroyed the rights and value of the property interests tied to the common and preferred stock of the Companies held by Plaintiffs and the Classes, nullified their reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the United States Constitution.

219.    In taking private property, the Government is required to adhere to due process of law and to respect the legal rights of affected parties.

220.    The Government violated the statutory, contractual, and Constitutional rights of Plaintiffs and the Classes in taking and/or illegally exacting virtually all the value of the above referenced common and preferred shares of both Fannie Mae and Freddie Mac that they owned, without providing just compensation.

221.    HERA did not authorize the Government to assert a conservatorship over either Fannie Mae or Freddie Mac at the time the conservatorships were imposed over them.

222.    As described herein, as a result of the Government's legally unsubstantiated imposition of the conservatorships, the Government destroyed the value of the stock held by Plaintiffs and members of the Classes, nullified their reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the United States Constitution.  The Government took and/or exacted the property and property rights of the

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

Companies' shareholders to improperly and impermissibly benefit private parties and public interests in at least the following manners:

a.      By causing the Companies to assume a significantly increased level of risky mortgages and mortgage-related assets prior to the conservatorships, thus leading to greatly diminished net worth and capital of the Companies;

b.      By improperly imposing the PSPAs and conservatorships over the Companies under false pretenses with no valid statutory basis;

c.      By forcing the Companies to assume the toxic assets of other financial institutions following the conservatorships, thus engaging in a "backdoor" bailout of those other financial institutions and lowering the equity value of the Companies; and

d.      By improperly taking all of the net worth of the Companies.

223.    Even when the Government takes or illegally exacts private property to serve public purposes, the United States Constitution requires the payment of "just compensation."

224.    The Government did not pay just compensation to Fannie Mae common and preferred stock shareholders or Freddie Mac common and preferred stock shareholders for the taking and/or illegal exaction of the value of their private property, equity interests in the Companies.  The Government's actions required it to pay just compensation to the Plaintiffs and members of the Classes under the Takings Clause of the United States Constitution.

225.    The Due Process and Takings Clauses of the United States Constitution protect shareholders from having their property and property rights taken and/or illegally exacted without just compensation.   As a direct result of the Government's violations of the United States Constitution, Plaintiffs and the Classes were injured, including monetary damage, as a direct and proximate cause of the Government's taking and/or illegal exaction of billions of dollars of

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

property interests associated with their holdings of Fannie Mae common and preferred stock and Freddie Mac common and preferred stock.  The Government is liable to Plaintiffs and the Classes for the injury it caused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Washington Federal, Michael McCredy Baker, and City of Austin Police Retirement System demand judgment in their favor and in favor of the Classes against Defendant, the United States of America, as follows:

A.     Determining that this action may be maintained as a class action;

B.     Certifying Classes of, (A) for Fannie Mae (1) all persons or entities who held shares of Fannie Mae common stock on or before September 5, 2008, and (2) all persons or entities who held shares of Fannie Mae preferred stock on or before September 5, 2008; and, (B) for Freddie Mac (1) all persons or entities who held shares of Freddie Mac common stock on or before September 5, 2008, and (2) all persons or entities who held shares of Freddie Mac preferred stock on or before September 5, 2008.

C.     Finding that Plaintiffs have met the requirements of a class representative and may maintain this action as representatives of the Classes;

D.     Finding that the Defendant has taken and/or illegally exacted Plaintiffs' and the Classes private property in violation of the Due Process and Takings Clauses of the United States Constitution;

E.     Determining and awarding Plaintiffs and the Classes damages suffered by them by virtue of the Defendant's taking and/or illegal exaction in the amount of $41 billion, or some other amount to be determined at trial;

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

F.      Prejudgment and post-judgment interest, together with any and all further costs, disbursements and reasonable attorneys' and experts' fees; and

G.      Granting all other relief as this Court may deem just and appropriate.


DATED:  March 8, 2018


                              By   /s/ Steve W. Berman
                                   Steve W. Berman
                                   Attorney of Record
                                   **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                   1918 Eighth Avenue, Suite 3300
                                   Seattle, WA 98101
                                   Telephone:  (206) 623-7292
                                   Facsimile:  (206) 623-0594
                                   E-mail:  steve@hbsslaw.com

OF COUNSEL:                        Jennifer Fountain Connolly
                                   **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                   1701 Pennsylvania Ave. NW, Suite 200
                                   Washington, D.C.  20006
                                   Telephone:  (202) 355-6435
                                   Facsimile:  (202) 580-6559
                                   E-mail:  jenniferc@hbsslaw.com

                                   Robert M. Roseman
                                   James E. McGovern
                                   Andrew Dodemaide
                                   **SPECTOR ROSEMAN & KODROFF, PC**
                                   1818 Market Street, Suite 2500
                                   Philadelphia, Pennsylvania 19103
                                   Telephone:  (215) 496-0300
                                   Facsimile:  (215) 496-6611
                                   E-mail:  rroseman@srkattorneys.com
                                   E-mail:  jmcgovern@srkattorneys.com
                                   E-mail:  adodemaide@srkattorneys.com

                                   *Attorneys for Plaintiffs Washington Federal,*
                                   *Michael McCredy Baker, and City of Austin Police*
                                   *Retirement System*

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER